ALBANY,
Oct. 1837.

The People
v.
Collins.

THE PEOPLE, *ex relatione* Case and others, *vs.* COLLINS and others, commissioners of highways of the town of Smyrna.

Where commissioners were appointed by an act of the legislature to lay out a road, on the most direct and eligible route, commencing at or near a certain village, and the road was laid out, commencing at the distance of sixty rods from the village, in a field where there was no road with which the new road could be connected, and the route, instead of being the most direct and eligible, was, as expressed by the court, strikingly injudicious ; yet, notwithstanding these facts, the court awarded a peremptory mandamus to the commissioners of highways of a town through which the road was laid, to proceed forthwith to open and work the road as laid out by the state commissioners.

Where the discharge of a duty created by act of the legislature is confided to a special commission, and the duty is in its nature judicial, this court will not collaterally review the doings of the commissioners, and hold as void the final determination made by them in the exercise of their discretion or judgment.

The same principle, it seems, applies to the decisions of all subordinate courts, special tribunals, commissioners and magistrates to whom judicial powers are delegated ; such decisions and determinations can be reviewed only by certiorari or writ of error, if no other mode of appeal is given by the statutes creating such courts, &c.

It also seems, although such subordinate tribunals in the exercise of the jurisdiction committed to them manifestly err, or even are guilty of an abuse of power, that an action for damages will not lie against them ; they being answerable only criminaliter.

In a matter of public right, any citizen of the state may be a relator in an application for a mandamus, (where that is the appropriate remedy,) to enforce the execution of the common law, or of an act of the legislature ; it is otherwise in cases of private or corporate rights—there the title to relief at the suit of the relator must appear, or the application will not be heard.

A mandamus to commissioners of highways to open and work a road, will be granted without regard to the near approach of the expiration of their offices ; when the term of office expires, their successors must obey the command of the writ.

Oct. 1837.    MANDAMUS. By an act of the legislature, passed 25th May, 1836, the relators were appointed commissioners to lay out a public highway " from the village of Earlville, in the counties of Madison and Chenango, on the most direct and eligible route, *commencing at or* NEAR *the said village of Earlville,* running in a southwesterly direction, and terminating at some proper point in the present road, at or

near the house now occupied by Hazard Wilcox, junior." The act authorized the performance of the duty by any two of the commissioners, and two of them accordingly laid out a road described as "commencing west of the village of Earlville, in the town of Sherburne, Chenango county, on the north line of said town of Sherburne at a certain point, and running southerly by certain courses and distances across the river to the highway leading by Hazard Wilcox, junior, intersecting said road near Julius Woods." The commissioners of highways of the town of Smyrna refused to open and work so much of the highway as lay in that town ; whereupon the relators applied for and obtained an *alternative mandamus*, commanding them to open and work the road, or to show cause, &c. The commissioners of highways made a return to the alternative writ, showing cause, *first*, that the relators having professedly performed all the duties imposed on them by the act under which they derived their appointment, are *functus officio*, and in their character of commissioners have no right to the relief sought. Neither have they that right as individuals, as it does not appear that either of them are citizens of Smyrna. *Secondly*, that the road is not laid out pursuant to the authority conferred by the act. The defendants return a map of the road as laid out, and then proceeded as follows : " The road is not laid out in the most *direct and eligible route*, commencing *at or near the village of Earlville*, and terminating at a point in the present road *at or near the house now occupied by Hazard Wilcox, junior*," within the meaning of the act. On the contrary, they insist that the *most direct and eligible route* is indicated by a certain red line on the map, beginning at a point near *Earlville corners*, and running courses and distances pointed out, a southerly course, varying from the courses and distances run by the commissioners, and terminating at the *house of Hazard Wilcox ;* that in the line as run by the relators, the place of beginning is 60 or 70 rods distant from the village of Earlville, in a field, where no public road is expected to be made ; whereas the line as proposed is nearer Earlville, and connected with a public road ; that the termination of the line run

ALBANY,
Oct. 1837.

The People
v.
Collins.

by the relators is at the house of Julius Wood, 25 rods north of Wood's school house : both which buildings have stood where they now stand for several years past, and that the road *as proposed by them* would be more direct, the formation of the ground better, the expense less, and the public better accommodated, &c. Upon the coming in of this return,

*J. Edwards*, in behalf of relators, moved for a *peremptory mandamus*.

*S. Stevens*, contra.

*By the Court*, COWEN, J. Taking the return of the defendants to be correct, as on this motion we must do in settling the question of a peremptory mandamus, the route adopted by the commissioners under the statute was strikingly injudicious. That, however, is not enough to warrant the disobedience of the town commissioners. They are required by the statute to open and work such road as should be laid out by the commissioners named in the statute, to begin *at or near Earlville*, and terminate *at or near Wilcox*, adopting the most *direct and eligible* route. The word *near*, as here used, is a relative term, quite indefinite ; and the precise points were purposely left to be settled by the commissioners appointed by the act : equally so the question of directness and elegibility. Their duty was *judicial;* and they having fixed the route, the town commissioners are concluded. This follows most clearly, if the other commissioners have not exceeded their jurisdiction ; and I think they have not. All this I thought so clear, upon the argument, on general principles, on the case there cited of *The People* v. *Denslow*, 1 Caines, 177, and other cases within my recollection, that I told counsel they must consider this point as decided against the defendants. A reference was afterwards furnished to *Griffin* v. *House*, 18 Johns. R. 397, which has led me to review the point.

In *The People* v. *Denslow*, the statute directed a turnpike company to erect their most westerly gate *near John*

*Van Hoesen's dwelling house;* and they placed it 8 chains and 15 links *from* the house. The court held that the statute vested a discretion in the company; and they add, " So long as this gate be near to Van Hoesen's house, which is conceded to be the case, we have no right to interfere, &c. This would be the same as to say that they shall not do what the legislature have given them permission to do. In *Griffin* v. *House,* the statute directed the company, on a road of 19½ miles in length, to erect their easternmost gate *near* the line of Massachusetts. They first erected their gate within 1¾ miles, which they afterwards removed to within 1 mile, and finally, after some years, changed it to 2¾ miles from the line. An action was instituted against the toll gatherer for exacting and receiving toll at the latter point, and the action was sustained. Two grounds were stated by the court; One was, that the gate was not placed *near* the line, within the meaning of the act; the other, that when the discretion had once been exercised, the power of the company was exhausted. On the first point, they remark that the gate " was to be *near* the Massachusetts line. This is a relative term, and regard must be had in construing the act to the length of the road, which is about 20 miles. In the case of *The People* v. *Denslow,* this court decided that a gate placed at the distance of 8 chains and 15 links from the house of John Van Hoesen, was a legal exercise of the power granted by the act requiring the gate to be near his house; but there must be some limit to the discretion given, and we are clearly of opinion that, considering the extent of the road, a gate 2¾ miles from the Massachusetts line, is not placed *near* that line."

If it were possible to suppose any other case to which these remarks could be applied as a precedent, clearly they furnish no guide for a case compounded of *nearness in the termini* and *eligibility in the route.* The decision, moreover, is undoubtedly sustainable, on the ground that the power of the company had become exhausted by their first act. It was unnecessary, therefore, to consider whether, in a matter of conceded discretion, such as was presented by that case, it be safe to try the question of its proper exer-

cise in a collateral proceeding. I will only say as to this, that the moment we allow it, a door is opened for litigation of the very worst character; the very worst, because there can be in the nature of things no rule by which discretion is to be precisely measured. The primary commissioners fix one distance; the justice, before whom their judgment is put on trial, another; the common pleas, on certiorari, another; this court another; the court of errors still another. There the law of the particular case ends; and all others, where the original tribunal is to exercise the least discretion, are left to be groped out in the same way. The principle would extend to almost every case calling for decision on a question of fact or law. Matter of discretion is but another name for matter of judgment, which always makes a part of the merits in every controversy. The very act of creating a board for determining controversies and settling rights, implies that the legislature cannot themselves determine and settle. They therefore delegate judicial power to others, with the intent that they shall hear, try and determine finally. This is so of every court, every magistrate and every commissioner. *Rex* v. *Hervey*, 1 Black. R. 20, was under the statute 19 Geo. 2, requiring the court of king's bench to award execution of death against one accused of smuggling, &c. who should not surrender himself within a certain time after the sheriff should have proclaimed an order of council, commanding a surrender, at two market towns in the county, and *near* the place of the offence. One of the proclamations was made within six miles, and of two others, one at thirty-three and the other forty-two miles distant, whereas there were four or five market towns within eight or nine miles. On being called upon to pass sentence of death, the court denied that the directions of the act had been strictly pursued, as is necessary in penal laws; not that by *near* must be understood *next*, but there must be a reasonable vicinity, of which the court will judge. I notice this case as showing a distinction between the direction to a mere ministerial officer, and where he is to judge. If the acts of the company in *Griffin* v. *House* may be said to have been ministerial, they

were open to review, otherwise not. Would any one suppose the opinion of the king's bench in *Rex* v. *Hervey* questionable, in a collateral way by action, had they erroneously adjudged the man to execution ; yet they were, in that matter, really but commissioners to award judgment in a summary proceeding.

As to the cases, however, I do not deny there are old ones in England and some in this country which give countenance to the ground now taken. They belong, however, to that severe line of decisions against magistrates, which are exploded by modern authority. It is not necessary to go over them. I shall content myself with referring to some which make a part of the modern doctrine, and noticing still fewer which hold the exercise of a much narrower discretion than is given by the act under consideration, to be conclusive. The following cases will be found either to lay down or illustrate the principle, or do both : *Duquet* v. *Watkins*, 1 Mill. Lou. R. 131 ; *Lining* v. *Bentham*, 2 Bay, 1 ; *State* v. *Johnson*, Id. 385 ; *Mackaboy* v. *The Commonwealth*, 2 Virg. Cas. 268, 271 ; *Osborn* v. *The Inh. of Danvers*, 6 Pick. 98 ; *Mather* v. *Hood*, 8 Johns. R. 44, 50, 51 ; *Holcomb* v. *Cornish*, 8 Conn. R. 375 ; *Martin* v. *Mott*, 12 Wheaton, 19 ; *Stuyvesant* v. *Mayor of New-York*, 7 Cowen, 585, 606, 7, 8.

In *Henderson* v. *Brown*, 1 Caines, 92, the assessment of a direct tax upon a theatre as a dwelling house, though it was not occupied as such, and should therefore have been assessed as land, was imposed by the assessors. Yet this adjudication of the assessors was holden to protect the collector in levying the tax as upon a dwelling house, though more in amount than it would have been if set down in the land list, Kent, J., said the assessors had jurisdiction of the subject matter. They were bound to assess that building in one view or the other ; and in the exercise of that duty, it is alleged and admitted that they did not exercise that judgment duly. But this is very different from the case in which they were not to exercise any judgment at all over the subject. The grievance is a mere error or mistake by them, while in the exercise of a lawful jurisdiction. See *Easton* v. *Calendar*,

11 Wendell, 95, per Nelson, J. So in the case at bar, the relators were bound to exercise judgment over the question of nearness and eligibility. This mistake of a theatre for a dwelling house was certainly very glaring, but not more so, I should imagine, than that since made by the two justices in England, who had authority, on seizure and search, to condemn and direct to be burnt or sold *any boat* on the Thames suspected of carrying articles stolen or unlawfully procured from any vessel. Under this act, the plaintiff's *decked and registered vessel* of 15 tons burthen, had been seized by police officers, and condemned by the defendants, who were sued as trespassers. But the action was held not to lie, on the ground that the commissioners of condemnation had a discretion or judicial power over the question whether the vessel was a *boat* or not. All the judges delivered opinions *seriatim*, and their observations show how far it is our duty to go in sustaining the acts of inferior jurisdictions. Dallas, Ch. J. remarks, " a great deal has been said as to the danger that might accrue from magistrates giving themselves jurisdiction, and extreme cases have been put, as that of calling a ship of the line or seventy-four, a boat. Even if it were so, if the conviction be good upon the face of it, and term a ship a boat, it would be conclusive. It has been farther said that the party aggrieved is without remedy unless this action be supported. It is true that he is without a civil remedy, but he still may have recourse to a criminal proceeding. If the facts were so gross, and the defendants had decided that a man of war was a boat, it would not only be an abuse of power, but furnish sufficient ground for a criminal proceeding. There is another principle on which this action cannot be supported; formerly the rule was to intend every thing against a stinted jurisdiction, but now nothing is to be intended but what is fair and reasonable; and it is a fair and reasonable intendment that magistrates will act uprightly in the discharge of their duty as such, and therefore a summary jurisdiction is vested in them, and their determination is final. It is a great benefit to the public, that their determination in cases of this and the like nature should be so." His lordship then re-

views the cases which were cited in argument as making against the adjudication, and going to prove it a nullity. Park and Burrough, justices, cite many authorities in support of the doctrines of the chief justice, and express themselves very fully on the question. Richardson, J., argued to the same effect and put several extreme cases. He supposes a magistrate under the game laws to convict an unqualified person of having a *patridge* in his possession, and asks, " Could, after conviction, in an action of trespass against him, evidence be adduced by the party convicted to show that it was a *woodcock?* The magistrate in such case is fully empowered to inquire into the fact; and yet it might be contended in that case, that the magistrate had no jurisdiction unless the bird were a partridge." So of a conviction of a person of keeping dogs for the destruction of game. " Can it be said that such person, after the conviction, could *in a civil action against the magistrate, be let into evidence* to dispute the truth of such conviction, or show the nature and description of the dog?" *Brittain* v. *Kinnaird*, 4 Moore, 50. I cite from Moore, as the more full report; the same case is reported in 1 Brod. & Bing. 432.

In all these cases the jurisdictional question raised was the very point to be decided by the magistrate. So our insolvent law, to entitle a person to a discharge from his debts requires a petition from two-thirds in amount of his creditors. Yet it is no answer to a discharge pleaded, that two-thirds did not petition. It is enough that the petition and proceedings purport to contain two-thirds. " Whether the debts are really due and to the amount stated is one of the questions and one of the most important questions to be judicially inquired into and determined, after the court has acquired jurisdiction." *Betts* v. *Bagley*, 12 Pick. 572, 582.

After these cases, as well as upon principle, it would be a strange anomaly that the defendants in this *mandamus* should be allowed to set up their own judgment as commissioners of highways against the decision of the state commissioners. It is the duty of the defendants to obey the judgment which has been rendered, were all the towns in the

The People
v.
Collins.

line of the road unanimous in saying the state commissioners have erred.

Let us not be told that the principles stated and the authorities by which they are sustained do not go equally against a collateral trial of the question upon a mandamus as in an action of trespass against the state commissioners. Suppose a constable to return to a mandamus that he would not obey an execution because the justice who issued it had erred in his opinion, and his judgment should be reversed on certiorari. He might as well do so. The commissioners of highways are, like him, mere ministerial officers. See per Woodbury, J., in *Farewell's case,* 2 N. Hamp. R. 124.

Under the statute in question the state commissioners were to take an oath of impartiality, and after locating the road they were to cause it to be surveyed, and a survey for each town through which it should pass was to be filed with the town clerk. All this has been done. The act then peremptorily directs the commissioners of highways of the respective towns to open and work the road. Laws, sess. of 1836, 738, § 2.

But the question whether the commissioners have any right to interfere as relators, is raised, and the objection struck me at first as perhaps well founded. The relators were, as we have seen, made judges, not parties in interest ; and it is a general rule that a relator must show an interest or title to interfere. If he do not, it seems to be an objection even on error. Such was the opinion of Chancellor Walworth, who examined this point upon principle and on several cases, in *The Commercial Bank of Albany* v. *The Canal Commissioners,* 10 Wendell, 30 to 33, on error from this court. The writ does not make title even by showing that the commissioners are inhabitants of the town of Smyrna. It is said that two of them appear by the statute to have been so when that passed. It does not follow that, if this could be received as evidence, they were so when the writ issued. But if they were, I imagine that this gave them no interest beyond that of any other citizen of the state. The road when laid out became a public easement, the legal

right vesting in the people ; and the question is whether any one may inform and obtain a mandamus in such a matter.

Most of the cases respect private or corporate rights. Courts or officers or corporations are to be put in motion with a view to enforce some matter of private interest. In such case the *title to relief* at the suit of the relator must appear, and he should present himself as a party ; otherwise a mere stranger might obtain a mandamus officiously and for purposes not at all desirable to the real party. See per Abbott, Ch. J. in *Rex* v. *Sheriff of Chester*, 1 Chitty's R. 479. In matter of mere public right, however, it is otherwise ; here the people are the real party, as in the other case they are the nominal. Yet it is well known that they cannot act except through individual information, by their attorney general or some private person. The latter is the constant course in procuring indictments, which, on being found, may then, by permission of the court, be pursued either by the public prosecutor or by private counsel. The power of this court to grant a mandamus at the suit of the people to compel the commissioners of highways to perform their duty has often been exerted and cannot be questioned. *The People* v. *The Commissioners of Salem*, 1 Cowen, 23. *The People ex rel. Palmer* v. *Vail*, id. 589. *Ex parte Sanders*, 4 id. 544. In such cases the wrongful refusal of the officers to act is no more the concern of one citizen than another, like many other public offences. It is at least the right, if not the duty of every citizen to interfere and see that a public offence be properly pursued and punished, and that a public grievance be remedied. In *Rex* v. *White*, Rep. Temp. Hardw. 92, speaking of a mandamus for a public, as distinguished from a private object, Lord Hardwicke said, " The reason why we grant these writs is to prevent a failure of justice, and for the execution of the common law, or of some statute, or of the king's charter." In *Rex* v. *The Justices of Herefordshire*, 1 Chitty's R. 700, the court said they could grant a mandamus to the justices in sessions to elect a county treasurer; and that was then moved for by private counsel, without objection. In the cases before this court in respect to commissioners of highways, no one

thought of turning the relators over to the attorney general, with a view to obtain his authority. In *Rex v. Sparrow*, 2 Strange, 1123, a mandamus was granted commanding justices to appoint overseers of the poor. These and the like motions are generally made, I suppose, on the relation of some municipal corporator who feels a more lively interest in the matter for being so. But clearly, in the case of the public highway, his legal interest is no more than that of any other citizen. For obstructing it an indictment lies. A mandamus stands much on the basis of an information in nature of a *quo warranto*. Such an information had been obtained against the common council men of York, on the ground that they had not received the sacrament within six months, according to an act of parliament requiring this from officers of corporations generally, as a qualification to receive and hold their places. The party making the application had no connection with the corporation, which, it was not denied, would ordinarily be an objection; but in this case the applicant was received, Ashurst. J., observing that " where the application is made merely to disturb the local peace of the corporation, it is right to inquire into the motives of the party, to see how far he is connected with the corporation. But the ground on which this application is made is to enforce a general act of parliament, which interests all the corporations in the kingdom." Buller and Grose, justices, concurred. *Rex v. Brown*, 3 T. R. 574, note. In *Rex v. Stacey*, 1 T. R. 3, a case was presented in which it was admitted *the attorney general* might prosecute, but the court refused to receive *a private prosecutor*, on account of long acquiescence. Lord Mansfield said, the information might be refused on other circumstances warranting the court to say " you shall not make use of the king's name for such and such purposes." *Rex v. The Justices of the West Riding of Yorkshire*, 7 T. R. 463, was an application, by a private individual, for a mandamus commanding the quarter sessions to render judgment on an indictment for a nuisance in obstructing a highway; yet no objection was made because the prosecutor was a private person. The court said the proper remedy for the prosecutor was by

writ of error, because the return showed an imperfect judgment. In *Rex* v. *The Commissioners of the Land Tax for the Parish of St. Martin in the Fields, in Westminister,* a mandamus was granted to compel the defendants to elect a clerk. 1 T. R. 146. This was on the relation of a private individual; at least the attorney-general did not appear in the matter. A public statute commanded the commissioners to appoint the clerk.

ALBANY,
Oct. 1837.

The People
v.
Collins.

There are many other cases in the books moved by private persons, which were yet founded on matters of as general and public a nature as those presented by the case at bar. No doubt the attorney-general might very properly have moved in this case, and had all private citizens refused to interfere and give information, it might have been necessary; but I cannot collect from any of the books or the reason of the thing that he alone has power to move. It is not for the defendants to object that several responsible relators appear in the matter.

Beside, the defendants have made a return and put the matter in a train for decision on the merits. In this public matter, there is no doubt the proper parties are before the court. In theory the people are always the plaintiffs, and they are actually so when individual right is out of the case. The objection is not matter of title, as in *The Commercial Bank of Albany* v. *The Canal Commissioners.* It is a mere question of regularity in the mode of obtaining the writ; and in analogy to the like cases would more properly have been raised on the motion for the alternative mandamus, or if that was *ex parte* and without notice, by a direct motion to set aside the writ as having improvidently or irregularly issued. The attorney-general might then have been consulted, and the suit been summarily arrested, or the defect supplied by an appearance on his part. The return is in nature of a plea, which cannot set up mere matter of irregularity. That an objection of form should come before the return, is supported by the reasoning of the chancellor and several cases cited by him in *The Commercial Bank of Albany* v. *The Canal Commissioners.* Matter of mere abatement in a plea is overruled by matter in bar. It seems

to me, therefore, that it would have been too late to come with this objection, if it were well founded in principle.

It is moreover objected that a mandamus should not go against officers who hold by annual election, and we are referred to *The People ex rel. Teel* v. *Sweeting*, 2 Johns. R. 184. That was the case of a motion for leave to file an information in nature of a *quo warranto* to try the right of an acting town supervisor. It was denied because an issue could not be made up and tried till after the office would expire. The reason does not apply to the case at bar. The obligation sought to be enforced devolves on no particular set of commissioners, and no right is in question which will expire with the year. The duty is perpetual upon the present commissioners of Smyrna and their successors; and the peremptory writ may be directed to and enforced upon the commissioners of the town generally. To say otherwise would be a sacrifice of substance to mere form.

*Rule for a peremptory mandamus.*