THE PEOPLE on the relation of DEBENETTI a. THE CLERK of the NEW YORK MARINE COURT.

*Supreme Court, First District; General Term, June,* 1856.

N. Y. MARINE COURT.—APPEALS.—JURISDICTION OF N. Y. COMMON PLEAS.—MANDAMUS.

The act of 1853, authorizing an appeal from the decision of a single justice of the Marine Court, to the general term, does not take away the right of appeal from the Marine Court to the Common Pleas.

But such an appeal can only be taken from a determination of the Marine Court made at *general term.*

An appeal taken from the decision of a single justice of the Marine Court direct to the Common Pleas, is premature, and gives the latter court no jurisdiction.

Notwithstanding that upon such appeal the Common Pleas order the judgment appealed from to be reversed, it remains in full force; and it is the duty of the clerk of the Marine Court, to issue, on application, an execution upon it.

A mandamus will be granted to compel the performance of this duty by the clerk.

Appeal from an order of the special term, granting a mandamus.

The facts are fully stated in the dissenting opinion of Mr. Justice Whiting.

*By the Court.*—ROOSEVELT, J.—An order was made in this case directing a mandamus to the clerk of the Marine Court

to compel him to issue an execution on a judgment rendered by one of the justices of that court. The clerk objects that the judgment, although regularly rendered by the Marine Court had been regularly reversed by the Court of Common Pleas. The relator, on the other hand, contends that the reversal was a nullity—that the Common Pleas, in that stage of the proceeding, had no jurisdiction, that an appeal from the decision of a single justice of the Marine Court could only be taken, in the first instance, to the *three* justices of *that* court, and afterward, if at all, to the Common Pleas.

By the act of July 21, 1853, the jurisdiction of the Marine Court was greatly enlarged, and, as a consequence, it was deemed proper, at the same time, to provide additional safeguards for the correctness of its judgments. An appeal was accordingly given from any judgment " entered by the direction of *a single justice*," to the "*justices* of the same court at a general term." And the justices were authorized to appoint such general terms, that is, terms to be held by more than a single justice, " at such times as they deem proper."

The first question presented is, was this appeal, or, more properly, rehearing, in the same court, intended to supersede, not the occasion merely as it ordinarily would, but the right to appeal to a higher court? For it will be remembered that by the Code as it then stood—and there has been no express alteration—it was declared (§ 34) that the Common Pleas should have " power to review the judgments of the Marine Court." A jurisdiction thus clearly given—and, as it appears to me, so fit and proper in itself—could only be taken away by express words or necessary implication, neither of which exists in this case.

How, then, is this revisory control of the Common Pleas to be exercised?

The act of 1853, as well as the fitness of things, as it seems to me, clearly answers this question. It places the Marine Court, in reference to the Common Pleas, upon the same footing precisely as that upon which the Supreme Court stood in reference to the Court of Appeals. No appeal lay from the Supreme Court to the Court of Appeals (Code, § 11), until at last three justices of the former court had been consulted, and

until at least two, at general term, had made an "actual determination" of the controversy. The act of 1853, in providing for an appeal from one to three justices of the Marine Court, declares that the appeal shall be taken "in the same manner and with the like effect as appeals in the Supreme Court from the decision of a single judge to the general term."

One of the "effects" in the Supreme Court of an appeal from a single judge to three or more judges of the same court, is, as we have seen, that it enables a dissatisfied party—and is an indispensable preliminary—to obtain a review not only in the same court, but in another court. It was the only "manner" in which a party could carry his cause from the court below to the court above. He was required—for that clearly was the object of the legislature—to exhaust the functions of the one court before he resorted to the other.

And why, we may ask, should the legislature, in creating general and special terms in the Marine Court, have deviated from the uniform policy of our judicial system? I say unifom policy, because the rule contended for had been adopted not only in the organization of the Supreme Court, but in that of all the other courts in the city. The Court of Appeals, says the Code, (§ 11), shall have exclusive jurisdiction to review upon appeal every actual determination *made at a general term*, by the Supreme Court, or by the Superior Court, or by the Court of Common Pleas. No appeal, it will be seen, is allowed in any of these cases from one court to another court, until the judgment of the single justice of the subordinate court at special term has been affirmed or reversed by his brethren at general term. But this is not all; although there is no right of appeal in any case from either of the three named courts to the court above before the action of the general term, there is a right of appeal from all of them in every case after such action. Why, when extending the system of general and special terms to the Marine Court, should the Marine Court, I repeat it, be made an exception to the otherwise universal rule? Why should not all proceedings thereafter, to rehear or review, as to that court, be conducted "in the same manner and with the like effect," as in the case of all the other courts

60 ABBOTTS' PRACTICE REPORTS.

The People on the relation of Debenetti a. The Clerk of the N. Y. Marine Court.

in the district in which the organization of general and special terms existed?

Our conclusions are:

*First.* That the right of appeal from the Marine Court to the Common Pleas was not taken away by the act of 1853.

*Second.* That such an appeal can only be resorted to after an actual determination made by the Marine Court at a general term.

*Third.* That the appeal in the present instance was therefore premature, and gave the Common Pleas no jurisdiction; and that the judgment of the Marine Court at special term, being thus in full force, it was the duty of the clerk, when applied to, to issue an execution upon it.

It has been suggested, as a difficulty, that by the terms of the Code, which prescribe the mode of appealing from inferior courts to the Common Pleas, an appeal from a general term of several justices would be impracticable. The notice of appeal, it is true, according to the Code, must be served " on the justice or *his* clerk," the return must be made by the "justice," and the appellate court " may compel *him* to make the return," &c. But where is the difficulty in substituting the plural for the singular number in these cases? Is it not an amendment, or rather an adaptation, necessarily implied in the act of '53? The Revised Statutes had already declared, and if they had not, the progress of common sense would have dictated the same interpretation, that where the singular number is used, the plural if necessary, shall be deemed to be included. But the same chapter of the Code which requires the service of an appeal on " the justice," in the singular number equally requires its service on " the respondent" in the singular number. How then, upon the strict principles contended for, could there be any appeal, even from a justice, if the party called to respond to the appeal consisted of the plural instead of the singular number? In regulating the costs also, there is a certain sum given to " the appellant" on reversal, and to " the respondent," on affirmance; both, like the term " justice," nouns in the singular number.

The order should be affirmed.

WHITING, J. dissented.—The relator on the 6th day of June, 1855, commenced a suit in the Marine Court of this city against Haman Manchin and others, and on the 25th of June obtained a judgment by default. On the 28th day of August that judgment was set aside, and after three trials before a jury, he, on the 5th of December, 1855, recovered a judgment against the defendants therein for $250.

On the 8th of December the defendants in that suit appealed to the Court of Common Pleas, to which appeal Justice Birdsall made a return. The relator appeared in that court, and without taking any exception to its jurisdiction, argued the appeal. On the 3d of March following the Common Pleas reversed the judgment of the Marine Court, and awarded costs to the appellants.

On the 13th of March, 1856, the relator made an application to the clerk of the Marine Court, and desired him to issue an execution on the judgment so reversed, which he refused. On the 15th of March the relator applied to the justices of the Marine Court, for an order to compel their clerk to issue an execution upon the original judgment in that court. The Marine Court denied that application.

On the 17th of March, upon the affidavits on the part of the relator, an order was obtained from one of the justices of this court, requiring the clerk of the Marine Court to show cause before this court at special term why a mandamus should not issue against him, commanding him to issue an execution upon that *reversed* judgment.

The motion was heard upon affidavits at the special term, and an order made thereon that a peremptory mandamus should issue. An appeal from that order was taken to this court, upon which the questions here discussed arise.

This, therefore, is an attempt to review in an indirect way, under this writ of mandamus, a decision of the Court of Common Pleas, whose decisions and judgments are not the subject of review by us in any other manner.

The jurisdiction of that court is sought to be questioned, under the pretence that it is a court of inferior jurisdiction, and while the power of this court is not invoked to operate directly upon that court or its judges, we are asked to compel a subor-

dinate ministerial officer, a clerk of an inferior court, not only of the appellate court, but of another still more inferior, to be guilty of an act of *insubordination*, not only to his own court, but to its superior, the Court of Common Pleas; in short, to commit an act for which he would not only be liable to both courts, as for a *contempt*, but to the party against whom the execution would issue in an action of trespass, if under the Code I may be permitted so to nominate it.

Has the history of the administration of the law furnished a parallel for such a judicial wrong ?

1. I admit that the writ of mandamus is an original remedial writ. It is called a high prerogative process. It lies to all inferior tribunals, magistrates and officers—it extends to all cases of neglect to-perform a legal duty ; it applies as well to judicial as to ministerial acts. If the duty be judicial, the mandate will lie to the officers to exercise their judicial functions, but without any direction as to the manner in which it shall be done. It compels them to move, but it cannot compel them to move fast or slow, in a straight, angular, or on a crooked line. (The People *a.* The Judges of Duchess C. P., 20 *Wend.*, 658.)

If the duty be ministerial, then the writ will direct the specific act to be performed. In the case of a judicial duty, when the inferior tribunal has performed that, however erroneously, no other tribunal under this writ has a right to interfere with, or complain of, the manner in which they have performed it. (Judges of the Oneida C. P., *v.* The People, 18 *Wend.*, 79 ; People *v.* Collins, 19 *Wend.*, 56 ; People *ex rel.* Doughty *v.* The Judges of Duchess C. P., 20 *Wend.*, 658 ; The People *v.* The Superior Court of New York, 19 *Wend.*, 68.)

I am inclined to the opinion, that in cases of mere ministerial and administrative officers, where the duty imposed only requires the exercise of a *mere discretion*, this court cannot by mandamus correct that *discretion*, or supervise it. (Rex *v.* The Mayor of London, 3 *Barn. & A.*, 254 ; Rex *v.* Gloucester, 2 *Ib.*, 158 ; Rex *v.* North Riding, 2 *Barn. & C.*, 290 ; Rex *v.* Eye, 1 *Ib.*, 85 ; Wright *v.* Fawcett, *Burr*, 2041 ; *Lord Raym.*, 1244 ; *Fort.*, 283 ; *Ex parte* Barrett, 2 *Cow.*, 458 ; 11 *Pick.*, 189 ; *Ex parte* Bailey, 2 *Cow.*, 479 ; *Ex parte* Benson, 7 *Cow.*,

368; Gilbert *v.* Judges of Niagara, 3 *Cow.*, 59.) I know it has been held where the exercise of a discretion on the part of such officers has been manifestly unjust, the Court of King's Bench held that it was not precluded from interfering by this writ. (Rex *v.* Dr. Askew, *Burr*, 2186; *Ex parte* Becke, 3 *Barn. & A.*, 704; 10 *East.*, 404; Rex *v.* Lancashire, 7 *B. & C.*, 692.) In all those cases, however, it will be found that the officer had violated a *duty* which he was bound by law to *regard* in the exercise of his discretion.

In all these cases, however, the party seeking its aid must have a clear legal right, and be without any other legal, adequate, or specific remedy. This at least has become a principle of law, and I do not now remember a case of any dignity wherein it has not been in terms stated, apparently, as an excuse for the exercise of its tremendous power.

It was often said by Lord Mansfield, "that it was a very beneficial writ, and that the best method of preserving it was to be sparing in the use of it." (*Per Lord Kenyon, in* 6 *Term, R.* 168). In Rex *v.* The Justices of Suffolk, (5 *Ad. & El.*, 139), the Court of King's Bench held that it had no authority by mandamus to compel an inferior court of criminal jurisdiction to enter a verdict in a particular way. In *Ex parte* Hoyt, (13 *Peters*, 279), it was denied to be a proper remedy to correct an erroneous judgment or decree of an inferior court. It would not lie where a writ of error or an appeal would. (The People *v.* The Judges of the Oneida C. P., 21 *Wend.*, 20; *Ex parte* Nelson, 1 *Cow.*, 417; Boyce *v.* Russell, 2 *Cow.*, 144; State *v.* Holliday, 3 *Halst.*. 205). It will not lie to command an issue of an execution on a judgment which has been set aside, (Eldridge *v.* Fletcher, 1 *H. & W.* 199; *S. C.* 3 *Dowly*, 583; 3 *Black. Com.*, 110); nor to command an inferior tribunal to review a judgment already rendered, nor to reconsider a judgment, nor to grant a rehearing. (*Tapping on Mand.*, 110, 111). It never issues in a doubtful case. The *right* must not only be clear, but the *duty* plain and unequivocal. If it may subject a party to an action it will not be granted, (Rex *v.* Heathcote, 10 *Mod.*, 51, 61; Rex *v.* Dyer, 2 *Adolph. & E.*, 606; Rex *v.* Middlesex, 9 *Ib.*, 540); nor against an inferior ministerial officer who obeys a power which he is not able to resist.

It cannot be granted to command an inferior ministerial officer to execute the duties of his office, where the officer as such is subject to another authority by which he can be punished for his neglect, and with whom there is no collusion, thus the writ does not lie to command the treasurer of a county to obey an order of the Court of Quarter Sessions, because he is the servant of the sessions and amenable to them.

Clerks are servants of their respective courts, and punishable. by the judges of them; if we interpose to coerce such officers, we usurp the authority of the inferior court which has jurisdiction over them (Rex *v.* Wiltshire, 5 *N. & M.*, 349). The inferior court is alone answerable to the superior tribunal for the proper and due execution of such authority. So officers, whose offices are incident to courts, partake of the nature of the several courts for which they are appointed and which they attend, and the judges are the proper persons to censure their misbehavior; and, should they be mistaken, this court cannot relieve. (*Tapping,* 178).

Lord Kenyon, in Rex *v.* Bristow, (6 *T. R.,* 168), said " that the court had no difficulty, upon a proper case laid before them, in granting a mandamus to justices, to make an order when they refuse to do their duty; but it would be *descending too low* to grant a mandamus to their officer to obey their order; that the court might as well issue such a writ to a constable or other ministerial officer, to compel him to execute a warrant directed to him." The better reason is given by Coleridge, J., in (6 *Adolph. & E.,* 401), that the authority which made the order could enforce the fulfilment of its commands.

If this be the settled law of the land, as I believe it is, we have no right to issue this writ.

2. But there are other and more conclusive reasons why we should not issue it. There is no judgment of the Marine Court in favor of the relator; the judgment which he has obtained has been reversed. It is said that the Common Pleas had no jurisdiction to reverse it. The Code gives to that court " power to review the judgments of the Marine Court of the city of New York, and of the Justice's Courts in that city." It makes no provision for appeals from the decisions of the Common Pleas in such cases to any other court, nor to the final appel-

late Court of Appeals; nay, it positively takes away that right by declaring that " an appeal shall not be allowed in an action originally commenced in a court of a justice of the peace, or in the Marine Court of the city of New York," to the Court of Appeals.

Suppose this was not the case, what law constitutes us upon this writ, or in any other manner, an appellate court or a court of review over either the Marine Court or the Court of Common Pleas, upon any question of practice or of jurisdiction? None. The judgments of the Marine Court are subject of review only by the Common Pleas, and from their judgment there is no appeal. The judgments of the Common Pleas are no longer subjects of review by this court. Its judgments and decrees rise to the dignity and are of equal force, validity and effect with the judgments of this court, subject to the power of review only by the Court of Appeals, except in cases where the Court of Common Pleas exercise their appellate power.

They have the same right to pass upon a question relating to their jurisdiction that we have upon ours. But it is said that the Common Pleas erred in maintaining this appeal because the defendant in the Marine Court could not appeal from the judgment of the justice in the first instance, but should have first appealed to what is termed the general term of the Marine Court, and there awaited its judgment, and that not until then did his right of appeal arise.

Were I at liberty to examine this objection, I think there are several conclusive answers to it.

First. That the objection was not taken by the Marine Court, nor by the relator before the Common Pleas.

Second. It is too late to take such an objection after judgment.

Third. Under the former practice a writ of error would not lie from the judgment of the general term of either the Superior Court or Court of Common Pleas; to the Supreme Court it only lay to bring up the errors committed at the trial and exceptions taken there to the rulings of the judge. In a case where, upon error to the Court of Appeals, it should appear that the errors complained of were errors of the general term, the writ of error or appeal would probably be dismissed. (2

66      ABBOTTS' PRACTICE REPORTS.

The People on the relation of Debenetti a. The Clerk of the N. Y. Marine Court.

*Comst.*, 189 ; 4 *Ib.*, 137). To enable a party to go up on error, a fiction was resorted to by the courts, which, after compelling the party first to go to the general term of those courts, allowed the record of their judgment to be so made up as to show the decision to have been made and the exceptions to have been taken at the trial. The appeal being a substitute for the writ of error, the decision of the Court of Common Pleas is in conformity with and in analogy to the decision of the Court of Appeals.

Fourth. If the Common Pleas had not jurisdiction, the reversal stands for naught, and the Marine Court may direct the execution to issue notwithstanding the reversal.

Lastly. It is a mere question of practice, and so not the subject of an appeal. (Exparte Costar, 7 *Cow.*, 523 ; Allen *v.* Calhoun, 6 *Cow.*, 32 ; Exparte Brown, 5 *Cow.*, 31).

It is also urged that the Common Pleas have decided wrongly in denying the right of appeal from a decision of the general term of the Marine Court. That question could not arise in this case, were the cause legitimately before us on error—that right was not denied to the defendant in the Marine Court—nor was it insisted upon either by the party or the Marine Court. Again, it is a mere question of practice, and so not the subject of error. That court can raise the question by the justice failing to make return until after the cause is heard at general term. If the general term correct the errors of a single justice, no return will be required ; if they affirm the error, then the case goes up on the appeal as from the judgment of a single justice affirmed by the general term, but even this is entirely within the control of the Common Pleas.

In La Farge *v.* Norris, on the 17th of May last, the Common Pleas decided that an appeal from the judgment of the Marine Court entered by order of a single justice lies either to the general term of that court or to the Court of Common Pleas at the election of the appellant—and in the course of the opinion of the court, delivered in that case, they took occasion to advert to two decisions made by this court at special term, one by Justice Peabody and the other by Justice Clerke, the latter, The People ex rel. Figaniere *v.* The Justices of the Marine Court was affirmed at the general term of this court.

(2 *Abbotts' Pr. R.*, 240). In regard to those cases the Common Pleas say, " that the question as to the right of appeal to this court was not necessary, and the opinion then expressed can hardly be considered an authoritative decision of even one of the justices. That Justice Cowles, who delivered the opinion of the general term of this court, was silent *upon the point now under consideration.*" With temperance and modesty, and with an honorable dignity that does the judges of that court high honor, they, by their presiding judge, in language not to be misinterpreted or to be misunderstood, and as if to avoid the very conflict now threatened, unanimously say " that the former decisions *relieved them from any embarrassment which might arise from having a full determination by the Supreme Court of this District adverse to the views heretofore expressed by this court thereon,*" and then add (what seems to me to be perfectly proper, in answer to the saying,—that the decisions of the Supreme Court should control their court until the same have been reversed by the Court of Appeals.— " When we take into consideration the fact that the jurisdiction of this court over appeals from inferior courts of this city is exclusive and the decision thereon final, that the jurisdiction of this court is co-ordinate with the Supreme Court in the actions brought therein, and the decisions of this court are *not* subject to *review at all* in that court, we should not be willing to admit such an *effect* to follow from a decision of the Supreme Court, *even* at general term. In cases which were pending while the Supreme Court had an appellate jurisdiction we have yielded to the decisions made in such cases, but have never recognized those decisions as having any further control."

In that case the Marine Court had issued an execution upon a judgment which had been reversed by the Common Pleas, and in defiance of such reversal. The act was attempted to be justified under the decisions of this court, made at special and general terms.

The Common Pleas, pursuing the even tenor of its way, and in obedience to what I deem to have been its duty, quietly and unostentatiously enjoined the officer and the plaintiff from reaping the fruits of his illegitimate remedy. They held, as I

68    ABBOTTS' PRACTICE REPORTS.

The People on the relation of Debenetti *a.* The Clerk of the N. Y. Marine Court.

believe rightly, that "by a reversal of a judgment of the Marine Court in the Common Pleas, that judgment ceased to be of any validity"—and granted an injunction against proceeding thereon. Their injunction went forth, and the decisions of the special and general terms of this court fell *lifeless* at the feet of this inferior court.

Are we now to pass by the judges of these respective courts, on this conflict of jurisdiction upon questions of mere practice, and compel this clerk to stand the brunt of the battle? Is he to be put to the trouble, cost and expense of this litigation to settle that question—a question in which he has no interest? He has once obeyed a decision of this court, and his process has been rendered nugatory. If this court was right before, is it all powerful to decide, but powerless to enforce its own decisions?

Suppose we issue this writ, does not the same peril threaten the officer and party upon the execution that was incurred in La Farge *v.* Norris? Will not the clerk of the Marine Court, besides, stand in the peril of an attachment by the Court of Common Pleas, after the decision of that case? Will he not be liable to be sued for a trespass by the defendants in the execution?

A reversed judgment is no judgment; "it is altogether held for naught." Will this mandatory writ furnish him a shield for protection? Not at all.

Will it be said, that if the Common Pleas commit the clerk for a contempt, we can relieve him upon habeas corpus? *If we can,* that court can recommit as often as we discharge; and so this poor clerk may well exclaim, "I cannot *well* serve *two* masters, but here I am required to serve *three*. My masters disagree, and a stranger steps in and punishes me for my obedience to them." Reverse this spectacle; suppose the clerk should refuse obedience to our writ? The only mode of enforcing it is by his commitment. He appeals to the Common Pleas for protection; they will surely unlock his prison doors, and throw around him their panoply. Will not this be the inevitable result?

Such a conflict will not only be unseemly, but render the whole matter a mere farce. The degradation to which the

science of the law has been already reduced, need not be made more wretched, under the excuse that the harmony of the Code requires the enacting of the scenes.

Whoever desires to be delighted with the harmony of the Code and of the practice of the law under it, surely may find enough without this to make his " whole head sick, and his whole heart faint," under the music of Voorhies' last edition, and the discordant sounds that already issue from some twenty volumes of reported cases which have arisen under it.

The consequences to flow from the use of this writ are not to be overlooked ; the value of our judicial system depends mainly upon the public confidence in it; with a country already distracted by its high prosperity and intestine broils, we are about to enter upon a warfare most surely to reflect discredit and disgrace upon this court, redounding only to the honor of the Common Pleas ; which court has hitherto acted with great forbearance and marked wisdom. My opinion is, that the order of the special term should be reversed.