Mr. Justice Wesicott
delivered the opinion of the court.
This is a proceeding by mandamus. The relators are registered voters and actual residents of the city of Jacksonville. Without narrating at length all of the allegations contained in the alternative writ, it is sufficient to say that a failure upon the part of the mayor and aldermen of the city to call an election for their successors in office in accordance with an ordinance 'of the city regulating the subject, is alleged.
It is unquestionably true that if the ordinance claimed to be in force is operative that the respondents have failed to perform their duty in the matter as alleged. They, however allege that the ordinance providing for an election of their successors at the time stated is not in force, having been repealed, as they say, by subsequent legislative" afction affecting the corporation of the city in such manner that it is in no wise their duty to call sucji an election.
* The city of Jacksonville, it is not denied, was a corporation under and by virtue of the “act to provide for the incorporation of cities and towns, and to establish a uniform system of municipal government in this State,” approved February 4, 1-869. Nor is it denied, if that act is now in force as to the city of Jacksonville, that the ordinance directing the election to be held was the ordinance controlling that subject, or that it was the duty of the officers of the corporation to call the election, which it is the piirpose of -the relators here to compel them to call. The defence relied upon principally arises out'of-the act approved March 4, 1879> being an act to amend the act of February 4, 1869, and the acts amendatory thereof, “and to further vide for the organization and government of cities”
Section 4 of the act of 1879 provided “that all cities organized under the act approved February 4, I860, which now have or may at any time hereafter have sixteen hundred or more registered voters, may have powers and exercise any or all of the special rights, powers and privileges in this section hereinafter granted, in addition to the general powers and privileges granted under the said act approved February 4, 1869, as aforesaid, and the several acts amendatory thereof, so far as they are consistent herewith.” The special rights, privileges and powers granted thereafter in this section were, to some extent, organic in their character, and to some extent, they appertained to such matters as are usually regulated by ordinances of the city under a grant of general powers.
The 9th subdivision of the 4th section of tlie act of 1879 provided that any city now containing sixteen hundred or more registered voters which .may elect to accept the provisions of this section, so far as the same may change in any manner - its existing form of municipal organic ition, .and the election of its municipal officers, shall, before the date of its first anmial election as now provided by any ordinance of said city, declare such acceptance by ordinance duly passed according to law, whereupon such change shall take effect on and after Us first anmial election thereafter to be held ón the second Tuesday in December, as hereinbefore provided. It was threinbefore provided, that the regular annual election should be had on the second Tuesday in December.
If the act of 1879 is not in conflict with the Constitution, postponing as it does the annual election until December, then a failure of the mayor and aldermen to call an election until that time is justified by the law. If, on the other hand, the power of the Legislature is so limited as to. render this -postponement in conflict with the Constitution, and the ordinance, adopted under the legislation of Í869 is in force, then they have violated the law in the failure to call an election; and if the right exists in the relators to compel them to call an election and a mandamus is a remedy appropriate to that end, they can and should be held to the performance of the duty. We first examine the constitutional questions, postponing the consideration of such other questions as we think involved to the determination of this, the most important matter connected with the cause.
The Constitution of this "State provides (Art. IV., Sec. 17,) “that the legislature shall not pass special or local laws in any of the following enumerated cases,” * * * “regulating county, township and municipal business; regulating the election of county, township and municipal officers.” “In all cases enumerated .in the preceding section, and in all óther cases where a general law can- be mqde applicable, all lhws shall be general and of uniform operation throughout the State.” (Art. IV., See. 18.) “The Legislature shall establish a uniform system of county, township and municipal government.” • Sec. 21, Art. IV.)
The amendatory act here changes in many very important respects the organic law of cities having, or which may have at- any time thereafter, sixteen hundred or more registered voters. These modifications were not to operate, . however, unless the city accepted them before" the date of its next annual election.
Under the act of 1869 municipal corporations were classified into cities and towns,, the city to contain three nun-dred registered voters, the town less than that number. Their powers were different, not, however, to any great extent, the difference being principally in the matter of authority to issue bonds; the city having .such power, while the town did not. Under the act of 1879 a new class, that, is cities having sixteen hundred or more registered, voters, _ *73 was created, and the powers conferred on this class were different from those conferred on the other two. It is thus apparent that the Legislature authorized by its action in these two statutes, first, a municipal corporation known as a city, to contain at least three hundred voters; second, a municipal corporation, known 'as a town, to contain less than three hundred voters; and thi^d, cities containing sixteen hundred or more registered voters, and that each class had different powers. It is also apparent that the existence of any municipal corporation of the third class depended, first, upon its being being before that time incorporated as a city; second, that it contained 1,600 or more registered voters; third, that it accepted the modifications proposed in its organic law by the act of 1879; and fourth, that it declared this acceptance before its first annual election as then fixed by ordinance. As to the first and second classifications, the Legislature has fixed their powers and duties. The power of each municipal subdivision'is the same. It is uniform. Each city has the same power. Each town has like authority, and each city and town is controlled in the exercise of its subordinate legis-ltaive discretion by like limitations, as well as by like grants of power. Under the act of 1879 each town retains the government it had before, but it is left discretionary with each city having 1,600 registered voters to retain its government under the act of 1869, or to accept the now government provided by the act of 1879, and all cities with a registered vote below 1,600 are held to the government of 1869.
We have stated the limitations and provisions of the Constitution. It cannot be doubted that the act of 1879 is an act “regulating municipal business.? (Sec. 16, Art IV.) Nor can it be doubted that such an act must bo a general law of uniform operation throughout the State, (Sec. 18, Art. IV.,) as well as such a law as conforms to the mandate to the Legislature that it “sliali establish a uniform system of municipal government.” (Sec. 21, Art. IV.) Is this a general law of uniform operation, and is it consistent -with a uniform system of municipal government?
We have been unable to find the exact counterpart of our Constitution in respect to these matters in the organic law of any other States. The word uniform, however, is of very frequent occurrence in constitutional limitations upon the power of taxation. A reference to these decisions is not deemed improper.
The Constitution of Arkansas provided that “laws shall be passed, taxing by a uniform rule all moneys,”&c. The Supreme Court of that State says “taxing by a uniform rule means by one and the same unvarying standard.”
The Constitution of California provided “that taxariou shall be equal and uniform.” In speaking of the power of the Legislature under this clause the Supreme Court of that State says, “it cannot discriminate between persons, or grant an indulgence to one which it does not grant to another standing in the same relation.” (35 Cal., 616.)
The Constitution of Louisiana provided “that taxation shall be equal and uniform throughout the State.” The Supreme Court of that State held that it would preclude a discrimination as between those carrying on the same business, but permitted like taxation upon all persons in the same trade or calling. These decisions are at least suggestive of a proper definition of the term “uniform” here.
There are, however, express decisions covering the defi-. nition of the terms “general law of Uniform operation,” as they occur in our Constitution.
Art. III., Sec. 30, of the Constitution of Iowa, (1857,) provides that “the General Assembly shall not pass local or special laws for the incorporation of cities and towns,” and that “all laws of a general nature shall have a uniform operation.” Under the statutes of Iowa municipal eorpo-rations were divided into three classes: Cities of the first and second class and towns. Each class had different powers and privileges. In speaking of the matter of uniformity in the operation of the statutes creating them, the Supreme Court of that State says (20 Iowa, 342): “These laws are general and uniform, not because they operate upon every person in the State, for they do not, but because every person who is brought within the relations and circumstances provided for is affected by the 3aw. They are general and uniform in their operation upon al! persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation.” It cannot be doubted that the act of 1879 is an act regulating municipal business, (84 Ill., 590,) and that such a law must be general and of uniform operation. The Constitution of Illinois had a similar limitation. Of this limitation the Supreme Court of that' State says,. (83 Ill., 590; 82 Ill., 473,) “it is not admissible, either by the letter or the spirit of the Constitution, that dissimilarity in character of organization or powers in municipalities of the same class or grade shall be created or perpetuated by enactments of the General Assembly,” and that “it is the substance and nor, the mere form given to the'enactment -which must determine its constitutionality.”
In the case of Smith vs. the Judge of the Twelfth Judicial District, (17 Cal., 554,) the Supreme Court of that State had occasion to construe a like clause in the Constitution. That court held that a general law of uniform, i peration was such a law as bore equally in its burdens and benefits upon persons standing in the same category.
Our attention has been called to the case of Walker vs. Potter, 18 Ohio, 88. There the court held an act which was applicable to- only particular cities of the first class a general law of uniform operation throughout the State. The act was clearly a local act, as it was applicable to but one city of the first class, (31 Ohio, 608,) and if it involved a grant of corporate powers, (which the act of 1879, considered in reference to the city of Jacksonville, certainly-does here,) it was, according to the subsequent decisions in that State, unconstitutional. (31 Ohio, 608.) But, however this may be, the views of the court in that case are not given. The conclusion is simply stated through a per -w-riwn. It is in conflict with the better considered decisions in the other States, and we do not doubt the act in question in that ease was not a general law of uniform operation throughout the State? In view of these authorities, is the act of 1879 a general law of uniform operation throughout the State? Did the act create a class of municipal corporations of sixteen hundred registered voters or more, we do not doubt that it would be a general law of uniform operation, but such is not the case. The local option authorized makes it a matter of discretion with all cities containing sixteen hundred registered voters or more to remain in the class of cities containing 300 voters, with a municipal government prescribed for that class, or to be embraced in the class of cities containing 1600 or more registered voters under another and different municipal government for that class. In the event all the cities with 1600 or more registered voters should accept this act as the law of their organization, the. law might, in fact, have a uniform operation. That uniform operation, however, would be the result of chance and not of the operation of a fixed rule prescribed by tlie Legislature, wjhile the Constitution contemplates no such' contingency. The government in each class must be the same, and such must be the result of the action of the Legislature, independent- of the contingency of local discretion or option in the premises. The Legislature must itself, independent of acceptance by *74 such cities, so frame its enactment that (as expressed by Lite Supreme Court of Illinois,) there shall not be dissimilarity in character of organization or powers in municipalities of the same class. So much, therefore, of the net of 1879 -as authorizes a new class of cities, with additional powers in such cities, we think Unconstitutional.
In. view of this conclusion, based upon a consideration cf sections 17 and 18 of Article IV. of the Constitution, it is •not absolutely necessary that we should define sections 21 of the same article, but its construction is involved in the case and we think it proper. “The Legislature shall establish a uniform system of municipal government.” There is little difficulty in determining the signification of the word “system” in this connection, its general signification js plan, arrangement, method, and when used in reference to municipal government, it means simply rules and regulations for the organization and government of municipal corporations. Substituting this definition for The word .as used in the Constitution, the mandate \o the Legislature is-'that it shall establish uniform Tules and regulations for the government of municipal corporations.
It only remains to determine in this connection the signification of the word “uniform.” It is unnecessary to repeat here what has been said in regard to its signification when used with reference to the operation of laws through^ out the State. The term “system” indicating the plan and method of government embracing the rules and regu-1 lations operative in such plan and method, we cannot see that the word “uniform”'in this connection has any other or different meaning than we have given to it when considered in reference to the “operation” of a law. In other words, that a system of municipal government in which cities of the same class may have dissimilarity in character of organization as well as different powers, is not a uniform system within the meaning of the Constitution.' Uniformity indicates consistency, resemblance, sameness, a j conformity to one pattern. The Constitution does not prohibit a classification of municipal corporations, but it does require that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions. In this resemblance, in this sameness, in this conformity of each class to one pattern, consists the uniformity of the system, and this is essential to constitute a uniform system. This act does not thus necessarily operate, and for this reason and to this extent it is in conflict with organic law. So much of it as authorizes an election in December is inoperative, and the rule controlling the matter of election is that prescribed by the ordinance of the city adopted under the act of 1869 and the amendments thereof. The duty of the officers of the corporation was therefore to call an election for their successors in office.
The remaining grounds upon which a mandamus was resisted, concern the right of the relators as well as the remedy involved- The right of the relators here depends upon the constitutionality of the act of 1879, and for this reason it is insisted that a mandamus will not be granted in rhi» case. Several cases are called to our attention in this connection, .among others the ease of Smyth vs. Titcomb, 31 Me., 285. In that case the court held, not that it would not determine such question when properly presented, but that it did not lie with the respondent, a Collector of Taxes,to make the objection under the circumstances of that case, and this conclusion was based upon views of public policy in the matter of the collection and disbursement of revenue. (High Ex. Rem., sec. 143.) The other cases cited we have been unable to examine. Where action by a ministerial officer is sought to be compelled, be cannot set up that the’ acts of de facto officers concerning third parties are void for want of power in such office. (7 John., 549.) This we understand to be the rule in New York, 'filíese cases, however, differ materially from this. Where the question of the constitutionality of an act is presented iñ a proceeding of the character now befoie the court, the courts do not hesitate to examine and pass upon the question. (31 Ohio, 592; 29 Maryland, 521; 1 Kansas. 178, 9 Nevada, 217.) We cannot see that Hiere is anything in this objection. Nor is there anything in‘iho position that this proceeding involves a determination of- the right of the respondents to their offices. No judgment of ouster is sought. On the contrary, they are treated as de 'facto officers who have failed to perform a ministerial duty. They are treated as officers now discharging the duties of their ' offices, and mandamus is the proper remedy by which to enforce the performance of their duty when it is ascertained. This,^ and this alone, is the method by which to compel the respondents to call an election. Nor can we see, as is intimated, that the right of the relators to insin-tute this proceeding is doubtful. The relators here are municipal corporators. The interest is common to all of the corporators. The relief sought is not the protection uf a private right or interest. -The question is one of public right and duty, the discharge of which is sought to be enforced, is a public duty affecting alike all the people in the city. In such a case the State of Florida is regarded as the real party and the relators need only ‘show that they are corporators and as siich interested generally in the execution of the law. 19 Wend., 56; 57 Ill., 307; 1 Cow., 23; 1 Chitty, 700; 2 Strange 1,123; 1 T. R., 146; 48 Ill., 233; 3 Ind., 452; 37 N. Y., 344; 7 Iowa, 186. There are some’, Authorities to the contrary, but the rule as we announce, it is'the now generally accepted law. High Ex. Rem., sec. 431.
Nor is it any objection that the precise date at which the , election was to be held has passed. 4 East, 142; 29 Maryland, 523.
Such a doctrine would practically abolish the remedy by mandamus in such cases. The writ does not lie before,, ííut only after default in the performance of a ministerial duty. (Tap. Man., 209, 8 A. and E., 911,) and if it be a good defense to allege that the time fixed for its performance has passed, it is evident that the very ground upon which you must base your application for the writ becomes a sufficient reply to the alternative writ when granted.
Thus disposing of all the questions involved in this controversy, the result is that the judgment awarding the peremptory writ is affirmed, and the case is remanded with directions to the -Circuit Court to issue the peremptory writ.