THE INHABITANTS OF THE TOWNSHIP OF MORRIS, IN THE COUNTY OF MORRIS, *vs.* AMZI CAREY, SILAS H. ARNOLD AND LEWIS H. JOHNSON.

1. An action will not lie by the inhabitants of a township to recover from the trustees of a school district moneys erroneously apportioned to such district by the town superintendent, though such apportionment be procured by false and fraudulent lists of children within the district, made and furnished by the trustees.

2. The township has no right to the money for any other purpose than that prescribed in the act, viz., distribution among the school districts for school purposes, according to the provisions of the statute.

3. The trustees of the school districts, in making out a list of children under the 9th section of the act of 1846, (*Nix. Dig.* 735,) act judicially, and are not civilly responsible for error or fraud therein.

4. The truth or good faith of such list cannot be questioned collaterally.

5. The township corporations have no legal interest in the school moneys derived from the school funds, or from the appropriations made by the legislature, or from the interest of the surplus revenue, or from township taxation, after the said moneys have been paid over to the town superintendents.

6. The distinction between judicial and ministerial action considered.

---

Action of *indebitatus assumpsit* for money paid and money had and received. Plea, the general issue.

The case was originally commenced in the Morris County Circuit Court, and was argued before the Supreme Court upon the following certified case.

The issue joined in the above-stated cause, (*pro ut* the pleadings,) between the said plaintiffs and the said defendants, on the eighth day of October, eighteen hundred and fifty-eight, came on to be tried in the said Circuit Court, holden at Morristown, in and for the said county of Morris, before the Honorable Peter Vredenburgh, one of the associate justices of the Supreme Court, at which day came as well the said plaintiffs as the said defendants, by their respective attorneys. At which time, also, a jury was empaneled and sworn to try the issue joined between the parties.

Township of Morris v. Carey.

And thereupon the attorney of the plaintiffs opened and stated to the court and jury that the facts which the said plaintiffs would prove before the said court and jury in support of the said issue on the part of the said plaintiffs were as follows:

That the said defendants, for the year beginning in April, 1856, and ending in April, 1857, acted as the trustees of a school district, situate partly and mainly in the township of Morris, and partly in the township of Mendham, in the county of Morris, called the "Washington Valley District, No. 3;" that the said defendant, Amzi Carey, commenced acting as trustee in said district in the month of April, 1856, but that the other two defendants had acted as trustees of the school in that district for several years prior to that time; that all of said defendants had long resided in said district, and were well acquainted with it, and the inhabitants thereof; that in the month of April, 1856, two of the said defendants, Carey and Arnold, made out what they represented to be a true census, or list, of the children in said district, between the ages of five and eighteen years, capable of attending school, which the said defendants delivered to the Rev. Josiah P. Hall, superintendent of schools in and for the said township of Morris; that in and by the said return, the said defendants represented that there were 144 children in that portion of said school district which is situate within the township of Morris, between the ages of five and eighteen years, capable of attending school; that the said town superintendent received the said return, or list, believing it to be true, and not knowing to the contrary, and apportioned to said district its proportion of the money to be applied to the support of public common schools upon the statement of said return, giving to said district, in the apportionment of said money, a *pro ratâ* allowance for 144 children; that said superintendent, in the years 1856–7, made two apportionments of the moneys for schools in his hands or under his control, both of

which recognized said census return as true; that in the first one of said apportionments there was allowed to each child capable of attending school one dollar and six cents, and to the aforesaid district, for 144 children, $152.64; that in the second one of said apportionments, there was allowed to each child capable of attending school sixty-nine cents, and to the aforesaid district, for 144 children, $99.36, making in all, in both apportionments for said district, $252; and that the said defendants, during the same year, drew orders upon the said superintendent amounting to $270.80, upon which the said superintendent paid $261.88; that the said defendants would have been entitled to draw from the said superintendent the said sum of $252, had the said census return been true. But the complaint of the plaintiffs was, that said return or list, of children, was false and fraudulent, and that the plaintiffs expected to be able to, and would endeavor to prove, that at the time the said census return or list was made out by the said defendants, and by them delivered to the said town superintendent, there were only between forty and fifty children in said school district between the ages of five and eighteen years capable of attending school, and the plaintiffs would offer such evidence as they thought would show that the said return was known by the defendants to be false when they made and delivered it to the town superintendent; and that the said defendants knowingly and willfully made use of that false statement to defraud the said plaintiffs out of about $175. And furthermore, that if the plaintiffs should fail to satisfy the jury that the said defendants were guilty of actual, positive, willful and deliberate fraud, in respect to the making of the said return and in drawing the said money from the said town superintendent, the evidence would show such a case of gross negligence and carelessness on the part of the defendants, as to make them liable to re-pay the moneys so as aforesaid improperly and unjustly drawn by them.

Township of Morris v. Carey.

The plaintiffs, to maintain the issue on their part, called as a witness Jonathan H. Smith, who, being duly sworn, testified as follows: I reside in Washington valley school district, in the township of Morris; I have lived there a great many years; I know the defendants; they reside in that district; Amzi Carey has lived there over twenty years; Silas H. Arnold over twelve years; Johnson resides in that part of the district which lies in Mendham township, and so resided in 1856–7; Rev. Josiah Hall was town superintendent of Morris that year; he is now dead; the defendants acted as trustees of the Washington valley school district in the years 1856–7.

The plaintiffs further proved, and gave in evidence the report of the trustees of district No. 2, Washington valley, the incorporated district in said township, of the children in said district capable of attending school, between the ages of five and eighteen, with the names of the parents and guardians, made to the town superintendent April 9th, 1856, signed by Arnold and Carey, two of the defendants.

Also, an order drawn by the defendants, Arnold and Carey, upon the said town superintendent, directing him to pay to Chauncy J. Hurd, by the name of Chauncy Hurd, or order, the balance of last year's money, more or less, for teaching, bearing date May 23d, 1856, on which is endorsed a receipt for four dollars, the balance of last year's appropriation to district No. 3, dated May 23d, 1856, and signed by Chauncy J. Hurd.

Also, an order drawn by the defendants, Carey and Johnson, upon the said superintendent, dated July 1st, 1856, for the sum of ninety dollars, payable to Chauncy J. Hurd, or order, for one quarter's salary as teacher in Washington valley district, and endorsed by said Hurd.

Also, an order drawn by the defendants, Arnold and Johnson, upon the said superintendent for $81.55, dated November 1st, 1856, payable to Chauncy J. Hurd, or order, as part of one quarter's salary as teacher in Wash-

ington valley district, on which order said Hurd, by his receipt endorsed thereon, acknowledges the receipt of seventy-two dollars.

Also, an order drawn by the defendants, Arnold and Carey, on the said superintendent, dated 8th January, 1857, for $37.36, payable to Chauncy J. Hurd, or order, as a part of one quarter's salary as a teacher in Washington valley district, and endorsed by said Hurd.

Another order, drawn by the defendants, Carey and Arnold, upon the said superintendent, dated April 10th, 1857, for the sum of sixty-two dollars, payable to C. J. Hurd, as part of his salary for teaching one quarter's school in Washington valley district.

All of said orders purport upon their face, and have been drawn by the defendants, who drew the same as trustees of said school district.

Witness also stated that said Chauncy J. Hurd, to whom said orders were payable, was the teacher who taught the school in said school district during the years 1856–57.

The plaintiffs' attorney, for the purpose of showing the said list of children to be untrue, put to the said witness the following question: how many children had you living with you in April, 1856, between the ages of five and eighteen years? To which question the counsel for the defendants objected, on the ground that the evidence offered could not be admitted for the purpose of showing that the said list was not true, as to the number of children in the district at the time the said list was made out and returned; that said list was an official act done by the defendants, who made said list in the discharge of their duty as trustees, and could not be impeached or falsified in any collateral proceeding such as the present suit; that in order to correct or set aside the said list, a writ of *certiorari* must be brought, or some other direct legal proceeding instituted; and that until said return is set aside by some appellate court, in a direct proceeding instituted for that purpose, it must be received as true and unquestionable.

The counsel for the defendants also insisted that, if the said return could be disputed and falsified in this action, the defendants, in their defence, could show that similar errors or frauds had been committed in other districts in the same township, so that, upon the whole, the said Washington valley district received no more of the money for school purposes than their just and equal share.

The counsel for the plaintiffs insisted that, inasmuch as they undertook and offered to prove that the said return was knowingly made false and willfully fraudulent, it could be falsified in this action; and that if the defendants should offer to show that the trustees of other school districts had committed similar mistakes or frauds, such facts would constitute no defence to this action, and could not be proved therein.

The court, after hearing the counsel of the respective parties, sustained the objection, and decided that no evidence to controvert or falsify the said return or list was competent or admissible in this cause, and that all evidence to prove that fact must be excluded. And that if such evidence were allowed on the part of the plaintiffs, the defendants, in their defence, would be entitled to show, if they could, that similar mistakes or frauds were committed by trustees of other school districts in said township, which, if permitted, would lead to an interminable and impracticable investigation.

The attorney of the plaintiffs thereupon stated that as this action is based upon the fact that the said return was willfully and knowingly made false, and is fraudulent, the plaintiffs could not proceed with or sustain their action, unless they were permitted to prove the fact by evidence similar to that above offered (for which purpose they then had many witnesses present); and as the court had decided that they could not be permitted to prove the main and fundamental fact, it was useless to offer any more evidence, and no more was offered. And thereupon the said court ordered judgment of non-suit to be entered against the said plaintiffs.

The counsel of the plaintiffs thereupon moved the court to set aside the said non-suit, and grant a new trial; of which motion the court took time to consider, and certified the case as follows :

To the Justices of the Supreme Court of the State of New Jersey.

I, Peter Vredenburgh, judge of the Circuit Court of the county of Morris, do hereby certify the foregoing state of the case for the advisory opinion of the Supreme Court, pursuant to the statute in such case made and provided, upon the following questions :

1. Assuming the facts in the opening of the plaintiff's attorney to be proved, can this action be maintained upon the pleadings in this suit?

2. Did the court err in rejecting the evidence offered by the plaintiffs to falsify the said return or list of children ?

3. If this action can be maintained upon the pleadings in the cause and the proofs offered by the plaintiffs to sustain the issue on their part, can the defendants, in defence of this action, prove that errors or frauds similar to what are charged upon the defendants were committed by trustees of other school districts in the same township in the same year?

Argued at November Term, 1858, before the CHIEF JUSTICE, and Justices OGDEN and VREDENBURGH.

*Vanatta,* for plaintiffs.

The first question is, does this money belong to the township, so that the inhabitants of the township can bring an action for it?

School money arises from three sources : 1, the state fund; 2, money raised by tax ; and 3, the interest on the surplus revenue. *Nix. Dig.* 734, §§ 9 and 10.

1. As to the state fund. The money is given to the counties, to be apportioned to the townships. *Nix. Dig.*

738, § 35. It is to be apportioned to the townships, according to the number of children, and is declared to be paid to the use of the inhabitants of the township. *Nix. Dig.* 734, § 11; 738, § 37.

2. Money raised by tax by the inhabitants of the township, by virtue of their vote, is township money raised for the use of the inhabitants.

3. The interest derived from the surplus revenue fund is the property of the township. *Nix. Dig.* 737, § 30. All funds for school purposes are paid over to the township superintendent, who gives bond, and accounts to the township.

The plaintiffs have an interest in the school money, coupled with a duty. If the funds are misappropriated, they are bound to bring an action. They may waive the tort, and sue in *assumpsit*. 1 *Chit. Pl.* 100 (11 *ed., note* 2); *Prior* v. *Craig,* 5 *Serg. & Rawle* 48; *Moses* v. *McFerlan,* 2 *Burr.* 1005.

Must there be a special count, or will the general count suffice? 1 *Chit. Pl.* 289. Cases of money had and received apply to this case. The teacher may stand in the attitude of an agent, and then it was money had and received. The real question is, not what use they put the money to, but had they a right to draw it for any purpose. 2 *Greenl. Ev.,* § 113; *Brittain* v. *Loyd,* 14 *Mees. & W.* 762.

Cited *Guild* v. *Baldridge,* 2 *Swan's Tenn. R.* 295; *Adamson* v. *Jarvis,* 4 *Bing.* 66; *United States* v. *City Bank,* 6 *McClean* 130; *Boston & W. R. R.* v. *Dana,* 1 *Gray* 83; 4 *Ala.* 463; *Chit. on Con.* 601, 633–4; *McQueen* v. *State,* 2 *Carter* 413; *Dana* v. *Kembel,* 17 *Pick.* 545; *Clinton* v. *Strong,* 9 *Johns. R.* 370.

II. Did the judge err in rejecting evidence? We offered to show that there was an intentional false return to defraud the township. The act was no more a judicial act than that of a United States marshal in taking the census, or that of a toll-gate keeper in taking toll. There is no record of the list of children that may be impeached; the

officers are not required to be sworn ; there are no parties to the proceeding, no mode of review. It is nothing more than an *ex parte* interested statement.

Suppose the treasurer make a false report to the legislature, must *certiorari* be brought to set it aside? Taxes illegally assessed may be recovered back without *certiorari*, 16 *Pick.* 361, 399; 5 *Pick.* 452 ; 17 *Mass.* 461 ; 12 *Pick.* 7. The officer will not be protected when the act is fraudulent. *Moultonborough* v. *Tuttle,* 6 *Foster* 470. Being a mere question of fact; it could not be set aside by *certiorari.*

*J. W. Miller,* for defendants.

The money has gone into the hands of the teacher, to whom it ought to go.

Did the court err in rejecting the evidence ? By proving the number of children in the district, they cannot have a new census made ; it would affect the township and county, for county money was received on the certificate. The duties of the freeholders are based upon the return of the superintendent. *Nix. Dig.* 735, &c.

We might as well assail the census on which the apportionment of the fund was made by the legislature. The trustees are to decide who may attend school, and are to employ competent teachers ; and the fact whether a teacher is competent or not, cannot be submitted to the jury. It is a *quasi* judicial act, which the law intrusts to their judgment. *Easton* v. *Callender,* 11 *Wend.* 93 ; *Henderson* v. *Brown,* 1 *Caines* 102 ; 1 *Rawle* 143 ; *Cunningham* v. *Bucklin,* 8 *Cowen* 178.

Whenever the law refers it to the judgment or discretion to do an act, it cannot be impeached. 2 *Cow. & Hill's notes* 171. The act can only be impeached directly. 8 *Pick.* 218–226 ; *Freeman* v. *Cornwall,* 10 *Johns. R.* 470 ; *Tucker* v. *Freeholders, Sax.* 283 ; *Hoagland* v. *Culvert, Spenc.* 387.

II. The action cannot be maintained because the money

does not belong to the township. *Nix. Dig.* 735, §§ 1 and 3. The officers are administrators of the fund; they have no ownership, and neither the township nor the town meeting have any control over it.

This is a contest between two agents of the state. The twentieth section of the act of 1846 (*Nix. Dig.* 737) directs that all moneys received by the superintendent shall be appropriated to purposes of education. This money has been so appropriated, and the township cannot appropriate it. The complaint is, that we have got too much in one district. The distributee of a fund cannot sue the distributor for the share to which he is entitled. *Gidley* v. *Lord Palmerston*, 3 *Brod. & Bing.* 275; *Macbeath* v. *Haldimand*, 1 *T. R.* 172. If fraud was practised in this matter it was on the county, and not on the township.

III. An action of *assumpsit* cannot be maintained. There must be privity of contract, express or implied. The defendants never received any money, neither was it paid for their benefit. There must be proof of the receipt of the money. 1 *Saund. Pl. & Ev.* 165; *Chitty on Con.* 22, *note;* 5 *Pick.* 289; *Whitehead* v. *Peck*, 1 *Kelly* 140; *Maddox* v. *Kennedy*, 2 *Rich. L. Rep.* 102.

*Vanatta*, in reply.

The fundamental question is, did the defendants receive more money than they were entitled to receive for school purposes. The money was paid upon their written order. We insist that there were three in the conspiracy to defraud; and if we show that all are implicated in the scheme, the receipt by order of one or two of them will be sufficient.

The money was paid to the teacher by the defendants, to relieve themselves from liability; it was paid out of public funds wrongfully.

Suppose a check is drawn on a bank, when the drawer has no funds there, and the bank pays it, the bank may

recover. Here the check was drawn on the township for cash to a larger amount than there were funds, and the township paid it; it was an overpayment, and may be recovered back.

The CHIEF JUSTICE. This action is brought by the inhabitants of a township to recover from the trustees of a school district, within that township, moneys alleged to have been overdrawn by said trustees for school purposes within the district. The action is *assumpsit.* The declaration contains the common counts for money paid and money had and received.

By the act to establish public schools, (*Nix. Dig.* 735, §§ 9, 10,) it is made the duty of the trustees of each school district to make out and transmit to the town superintendent a list of the children capable of attending school between the ages of five and sixteen years within said district. It is made the duty of the town superintendent to apportion all the money received and raised by the township for the support of public schools among the several school districts, in the ratio of the number of children capable of attending school between the ages of five and sixteen years in each district. The list of children made out by the trustees of the several school districts within the township forms the basis for the distribution of the fund among the districts. The ground upon which the plaintiffs claim to recover is that, the defendants, being trustees of a school district within the township, made out and delivered to the town superintendent a fraudulent list of the children within their district, and, by means thereof, drew from the town superintendent a larger apportionment than the district was entitled to receive. The money thus appropriated to the district was paid over by the town superintendent, upon the written orders of the defendants, or some of them, as trustees of the district, to the teacher employed by them, for his salary as teacher in said district, pursuant to the statute.

Admitting the facts offered to be proved on the part of the plaintiffs, the case presented is, that the defendants, in their official character as trustees of a school district, by making out and certifying false and fraudulent lists of children within their district, in the apportionment of the moneys among the districts, obtained a larger proportion for their district than they were justly entitled to.

Admitting the wrong in its fullest extent, is this the appropriate remedy? Have the township a right, in this or any other form of action, to reclaim the money thus appropriated? If it be conceded that, while the money remained in the hands, or under the control of the township collector, it belonged to the township, so far at least as to enable them to sue for and recover it from any person by whom it was fraudulently or unlawfully obtained, yet the township is a mere trustee or agent for its distribution, and when the money has been apportioned by the town superintendent among the districts, according to the forms of law, the trust has been executed, the legal title to the money has been transferred from the township to the district. All title to, or interest in the fund, on the part of the township, in its corporate capacity, is at an end. The money has been paid over, pursuant to the directions of the statute, by the trustees to the beneficiaries. The complaint is that, in the distribution, a fraud was practiced by the agents of one district, whereby one of the beneficiaries obtained more than its just proportion. But for that wrong, the township in its corporate capacity, is in no wise responsible. Their superintendent was guilty of no wrong in making the appropriation, nor their collector in making payment. These officers acted strictly in accordance with the requirements of the statute. Nor has the township any right to reclaim any part of the fund. For what purpose will they do it? They have no title to it. They held it as mere trustees for the districts for school purposes. It has been paid over to the beneficiaries, for the purposes prescribed by the act—in erroneous propor-

tions it is true, but, as has been said, by no misconduct on their part or on the part of their agents. And should the township recover the money, what are they to do with it? They have no right to use it. They may simply pay it over to the order of the trustees of the different districts. But that has already been done. The apportionment has been made, and the money has been paid over. The township has executed its trust. It is not perceived that the statute confers any authority to make a new distribution of the fund, or that it prescribes any mode in which it may be made. And if the money be recovered in this action by the township, how are the several school districts in the township to obtain their share of the money thus recovered? Their only right to the fund is derived from the statute, and, by the terms of the statute, their title is founded on the apportionment made by the superintendent upon the basis of the lists of children certified and returned by the trustees of the different districts. In the absence of such apportionment, there is no authority in the township to pay, none in the district to receive any portion of the fund. If, in the event of the recovery of this money by the township, there is no mode in which it can be legally apportioned and distributed among the districts, there can be no ground for a recovery. The township clearly has no right to the money for any other purpose than that prescribed in the statute, viz., distribution among the school districts for school purposes, according to the provisions of the statute. If that end cannot be accomplished there is no reason why there should be a recovery.

But, admitting the legal right of the township to the fund, upon what ground is a recovery to be had against the defendants in this form of action? There was no money paid by the township for the use of these defendants, nor was any part of the money received by them. The money was paid, as appears by the evidence, to the teacher of the district school in the district of which the

defendants were trustees. It was paid, then, not to the defendants, for the use of the township, but to the teacher, for the use of the inhabitants of the school district. True, it was paid, as required by the statute, upon the order of the defendants, in their official capacity as trustees, but it was not paid to them nor for their benefit, except as inhabitants of the district.

Money fraudulently obtained by a public officer, under color of official forms, may, it is conceded, be recovered back in an action of *indebitatus assumpsit*, but then the money must be received by the individual or be appropriated to his use. But where public funds have, through the fraud or mistake of an officer, been diverted from their legitimate channel, and appropriated to other public purposes, or to the same purpose, but in a different mode or proportion from that contemplated by the statute, I know of no principle or authority which would render the officer liable to the public for money had and received to his use.

But if these technical difficulties were all removed from the path of the plaintiff, there is still an insuperable difficulty in attaining the ends of justice in this form of action. If this were a simple action brought by the township against the inhabitants of the district for the recovery of the amount paid to the district over and above its ratable proportion of the fund, what amount, *ex æquo et bono*, ought the township to recover? It would depend not upon the fairness and accuracy of the list of children in one district alone, but in all the districts in the township. It would involve other considerations The lists of children furnished from the different school districts to the township superintendent not only constitute the ratio upon which the money is to be apportioned, but the basis, also, upon which to determine the amount of taxation. Each township may raise by tax for the support of public schools such sum as they may deem proper, not exceeding three dollars for each child contained in the lists transmitted to

the town superintendent the year previous. *Nix. Dig.* 738, § 37.

If, therefore, the list of children in any one district contained, as alleged in the present case, one hundred more children than in reality existed, and the township raised the full amount authorized by law, not only would the amount of taxation be excessive, but it would be assessed upon the inhabitants of different school districts, in sums very disproportionate to the amount which they would be entitled to recover in the appropriation. To compel the district, therefore, to refund the excess received beyond its legitimate apportionment in the distribution of the school money, founded on an accurate list of the children, would prove but a partial correction of the evil. The sum thus recovered might be more or less than the sum which in equity they ought to receive.

Whatever wrong may have been committed by the misconduct of the defendant, it is clear that it cannot be redressed in this form of action; nor is a suit at law for the recovery of the money the appropriate remedy.

The Circuit Court should be advised that, assuming all the facts stated in the opening of the plaintiffs' attorney upon the trial to have been proved, the action cannot be maintained.

I am also of opinion that the Circuit Court did not err in rejecting the evidence offered by the plaintiffs to prove that the list of children made out by the defendants, and returned to the town superintendent, was false and fraudulent, on the ground, that the truth or falsehood of such return cannot be inquired into collaterally. Upon this point, I fully concur in the elaborate opinion of Mr. Justice Vredenburgh.

VREDENBURGH, J.  This was an action for money had and received; the plea the general issue.

The plaintiffs opened, that the defendants were school trustees, during the years 1856–7, of district number 3 in

said township; that, as such, they drew orders on the school superintendent, for the sum of $252, in favor of the teacher, which was paid to him upon his endorsing the orders; that the said sum had been apportioned by the superintendent to the district, as its proportion of the school money received that year from the township collector; that the apportionment had been made upon the basis of the return by the defendants, as such trustees, dated April the 9th, 1856, to the superintendent of the children in said district, and that such would have been the correct amount to be so apportioned if the said return had been true; but that it was untrue in this, that it returned 144 children of the required qualifications, whereas there were only 40 or 50; and that said return was intentionally false and fraudulent, or made so carelessly as to make the defendants liable to repay the money.

The plaintiffs, having thereupon given the said return and orders in evidence, put to the witness, for the purpose of showing the said list of children to be untrue, the following question—how many children had you living with you in April, 1856, between the ages of five and eighteen years; which question the court overruled; whereupon the plaintiffs suffered a non-suit.

The court then, upon the plaintiffs' application, granted a rule to show cause, and certified the case to this court, for their advisory opinion upon the following points.

1st. Did the court err in overruling said evidence?

2d. Assuming the facts opened to be true, can this action be maintained upon the pleadings?

*First.* Did the court err in overruling the evidence that the return was untrue and fraudulent?

It was overruled upon the ground that the return was a judicial proceeding, and therefore could not be questioned collaterally.

The specific action required of them is prescribed by the 9th section of the act of 1846, (*Nix. Dig.* 735) which provides "that it shall be the duty of the said trustees,

within twenty days after their election, to make out a list of the children capable of attending school between the ages of five and sixteen years within their said districts, together with the names of the parents or guardians of such children, and transmit the same to the town superintendent; and in case the trustees shall neglect or refuse to render such report, they shall be subject, respectively, to a penalty of ten dollars for each neglect."

Is this prescribed action ministerial or judicial?

Let us first see how far the question reaches.

The funds that come into the hands of the town superintendent to be apportioned are derived from two sources—1st, from the state; 2d, from the township.

The fund derived from the state is the $80,000 appropriated by law. *Nix. Dig.* 738, §§ 1, 2. These funds are apportioned among the counties in the ratio of population. *Nix. Dig.* 738, § 1. After this money thus gets down into the counties, the act (*Nix. Dig.* 738, § 4,) provides that the board of freeholders shall apportion the same among the several townships, in the ratio of the number of children between the ages of five and eighteen, as shall be *ascertained* by the last annual returns made to the town superintendendents.

The *township* funds that come into the hands of the town superintendents are derived, in part, from the interest on the surplus revenue, (*Nix. Dig.* 788, § 10,) and in part from township taxation. *Nix. Dig.* 734, *pl.* 11, 30, and 37.

The whole school money of the state is thus passed down to the township collectors, and they are ordered to pay it over to the town superintendents; and then the town superintendents are ordered, by the statute, (*Nix. Dig.* 736, § 17,) to apportion the whole money so received among the several school districts, in the ratio of the number of children capable of attending school between the ages of five and eighteen, and to pay it over, on the orders of the trustees, to the teachers; so that it will be

perceived that the distribution of all the school funds, both state and township, in every county, township, and district of the state, is based upon this ascertaining of the children by the district trustees. The whole movement depends upon the finality of this ascertainment. If this return be in its nature judicial, the county collectors, the township collectors, the town superintendents, can safely pay over the funds, respectively, as commanded by the statute. They perform merely ministerial functions, and are liable to indictment for not doing so; and the whole school system moves on harmoniously. If there be error in the ascertainment by the district trustees, so there may be error in even the highest tribunals; and probably no other tribunal could have been created by the legislature to ascertain and adjudicate upon the children in each district having the requirements called for by the statute so appropriate as the district trustees. As regards fraud in the adjudication, that may also happen in the highest as well as the lowest tribunals; and the public, as in other cases, must be protected by future legislation and by the authors being held responsible to the voice of public opinion and to the criminal law. At any rate there must be a finality, as regards error and fraud, somewhere; and, from the very nature of the thing, I do not see where the legislature could have placed this adjudication more properly than where they have.

But if this action of the trustees be not judicial, then the truth and validity of all these returns may be called in question collaterally in any kind of proceeding which any parties may see fit to institute. It is easy to see into what indescribable confusion this would involve the distribution of the school fund. If this ascertainment is not judicial, and therefore final, all other persons have as good a right to their judgment upon this subject, and their judgment is worth just as much as that of the trustees. The board of county freeholders, the county collectors, the township collectors, the school superintendents,

Township of Morris v. Carey.

can never tell what to do. They may dispute these returns, and refuse to distribute, or, if they distribute, will become liable for any error in fact or law. The age, the residence, the capability to attend school, of every child in the state, might become to them a matter of litigation, and involve them in responsibility, upon the same principles as those upon what it is now sought to hold the defendants.

But the question reaches still further. If these returns can be questioned collaterally, I do not see why every taxpayer in the state may not raise the same question upon every assessor, every collector, every justice of the peace and constable, who undertakes to assess or collect a tax, and insist upon trying the propriety of the assessment over again in other forms of action, and hold them to answer upon every allegation of fraud or error. Indeed, I do not see to what extent the principle would not carry us.

The question, however, still remains—is this return of the trustees a judicial or ministerial act.

The statute says that they shall make out a list of the children capable of attending school between the ages of five and eighteen years within their said districts, and transmit the same to the town superintendent, and that the counties shall apportion among the townships, and the townships among the districts, upon the basis of these returns. Without these returns, the counties or the townships cannot apportion at all, nor have they any authority to substitute in the place of their returns any other mode of ascertaining the number of children in the districts capable of attending school.

The legislature makes provision for the yearly distribution of probably $500,000 for the purposes of education, and designed for the benefit of children between the ages of five and eighteen capable of attending school. For that purpose, they make provisions for dividing the state off into small districts: they provide for the distribution of these

funds among the counties in the ratio of population, and then that it shall be divided among the districts in the ratio of the number of children of a certain class in the several districts. The appropriation of this large amount, the requiring it to be apportioned to the counties and townships, was legislative action; the acts of the chosen freeholders and of the town collector and superintendents were merely ministerial action. But there was yet an essential thing to be ascertained before this beneficial design of the legislature could be carried out, and upon which the whole thing depended, and that was the number of children of the required qualifications in each district.

These trustees are certainly public officers. It is contended, by the plaintiffs, that their functions are merely ministerial, and not judicial.

What is the radical difference between judicial and ministerial action? By our state constitution, the powers of government are divided into three distinct departments, the legislative, the executive, and the judicial, and no person belonging to one department is to exercise any of the powers belonging to either of the others.

What, then, is the essential characteristic of this judicial action which constitutes one of the three powers of government, and which, with us, can never be exercised by either the legislature or the executive? Every law prescribes that, when certain facts arise, certain consequences shall be thereto attached. Its enforcement consequently requires three distinct acts of the supreme power: first, the enactment, which is the resolution that hereafter certain consequences shall attach to certain facts; this is legislative action. Second, the ascertainment and decision that certain facts have arisen which come within the purview of the resolution. This is judicial action, and involves two mental processes: first, the ascertainment if the facts exist; secondly, if they do exist, that they come within the purview of the enactment.

Having thus resolved and thus ascertained, the supreme power proceeds to do what it has resolved it would do upon the happening of facts thus ascertained. This is executive or ministerial action. The first two are mental, the latter is material action. All these three forms of action, the legislative, the judicial, and the executive, are always done by the supreme power, whatever may be the form of the government. Thus, in a despotism, one man enacts, adjudges, executes, either by himself or his agents. In our state, the ultimate sovereignty is in the people, who exert all these powers of government by their agents, the legislature, the judiciary, and the executive, whose power of attorney is the constitution. But, however these powers may be concentrated in one person, or divided among many agents, or however they may be mixed up in their execution, the boundaries between them are always distinct, and their essential natures can never mingle.

Now let us test, by these principles, the duties required by the statute of these trustees.

The enactment is, that the school money shall be divided among the school districts, in the ratio of the number of children capable of attending school between the ages of five and eighteen in each district. But so far it is a mere abstract resolution, like the law which prescribes that he who commits murder shall suffer death; and precisely the same thing is done in the one case as in the other, to wit, the appointment of a tribunal to ascertain the facts, and how far the law is applicable to them, and report by a list or a judgment record to the supreme power for executive action. The command of the statute upon these trustees is to make out a list of the children capable of attending school between the ages of five and eighteen within their said districts, and transmit the same to the town superintendent. Their duties are precisely of the same nature as those of the Oyer and Terminer. This ascertains whether a homicide has been committed, and

Township of Morris v. Carey.

whether it is murder, and reports by judgment, to the end that the supreme power may execute the law; the other ascertains the number of children, and whether, within the meaning of the law, they are within the district, whether they are within the ages of five and eighteen, and whether they are capable of attending school, and reports by list for executive action, to wit, the actual distribution of the money by the agents of the supreme power. The only difference is, that in the one case the report is called a judgment, in the other, a list; but they both represent the same ideas, to wit, ascertainment of fact and decision of law. They are both mere external evidences of internal mental results. It is contended, by the plaintiffs, that the trustees are commanded to make out a list, &c., and that this is merely ministerial action. But so the ordinary courts are required to make a record, and to sign judgment. Does that make them executive, and not judicial officers? The record in the one case, and the list in the other, is but the evidence required by law of the judicial action. Some physical act must always be done to evidence judicial or any other mental action; and whether by writing or by word of mouth, it is all mere evidence. The giving a verbal judgment, or signing a record, or making out this list, is a physical fact, but not ministerial action. It does not execute the law.

The trustees here are to adjudicate upon matters of both law and fact in regard to every child in the district. In the first place, it is to be a list of the children in the district. Is a child passing through, or on a visit there, or only there in the daytime, in the district, within the meaning of the act? Again, they are to be within the ages of five and eighteen. This must be a matter of some kind of investigation and decision with regard to every child. Again, they must be capable of attending school. What is meant by the term capable, in the statute? Does it mean physical capacity, mental capacity, pecuniary capacity? Does it include apprentices, idiots, lunatics, children engaged

in factories? Could this court determine these questions without judicial action? But does it change the nature of the action because, in the one case it might be done by us, and in the other by the trustees?

These trustees are special tribunals, created by the legislature to adjudicate upon and determine the ratio in which the school fund of the state is to be finally distributed. Their action has all the characteristics of judicial, and none of either legislative or ministerial action. The statute is legislative, the determination of the trustees is judicial, the apportionment of the money by the town superintendent is ministerial action. We have here in its various stages, law, judgment, and execution.

The books are full of cases where the actions of tribunals analogous to these have been declared to be judicial.

The case of *Easton* v. *Callender*, 11 *Wend.* 93, was an action against trustees of a school district in trespass, for issuing a warrant under which a cow was seized. The act of New York authorized the inhabitants of the district to raise money by tax for educational purposes, and the trustees to make out the tax list, and the amount of such tax to be set opposite the name of the party taxed.

Nelson, judge, in delivering the opinion of the court, says—" But conceding that the trustees erred in omitting to insert the names of all the taxable inhabitants, does it follow that they are trespassers? Their duties are various. Some partake of a judicial, and some of a ministerial character. The range of their official acts, imposed upon them by law, embracing these different functions, it is the duty of the court to separate them, and apply to each, as it comes up for consideration, its appropriate principle. The apportionment of the tax is, in my opinion, to a certain extent in the nature of a judicial act. They are to determine who are and who are not taxable within the provisions of the statute. They are then to apportion to each his share, according to the value of his real and personal estate.

Now is not the ascertainment, by the district trustees, of what children are within the ages of five and eighteen capable of attending school in the district, as clearly judicial as making out a list of who are taxable within the district?

The case of *Henderson* v. *Brown*, 1 *Caines' Rep.* 100, was an action of trespass against a tax collector, who justified under an assessment for tax. By the act, the assessor was required to insert all dwelling-houses in one list, and all lands without dwelling-houses thereon in another list, and the assessor had inserted a theatre in the list of dwelling-houses. The court held that the collector was justified, because the assessor, having jurisdiction of the subject matter, his finding could not be inquired into collaterally.

So in the case of *Cunningham* v. *Bucklin*, 8 *Cowen* 178, it was held that the action of a commissioner in discharging an insolvent was not questionable collaterally.

So in the case of *Williams* v. *Holden*, 4 *Wend.* 228. This was a suit brought against the town collector for omitting to collect a tax against an executor. The defence was that the assessment was illegal. The court held that the assessment could not be questioned collaterally.

So in the case of *Wilson* v. *The Mayor of New York*, 1 *Denio* 595. The court say that the power to make needful sewers is a judicial duty, and although the officer may not in strictness be a judge, yet if his powers are discretionary they are in their nature judicial, and he is exempt from all responsibility by action for the motives which influenced him.

So in the case of *Weaver* v. *Devendorf*, 3 *Denio* 117. The defendant was sued, as assessor, for willfully and corruptly refusing to allow the plaintiff the benefit of an exemption, and refusing to make a deduction for debts, &c. The court say, in fixing the value of taxable property, the power exercised by assessors is in its nature purely judicial, and the act complained of was therefore a judicial determination.

So in the case of *Van Renssalaer* v. *Cottrell*, 7 *Barb. Sup. Ct. R.* 128. The suit was against the collector, because the assessment assessed the plaintiff for lands occupied by other persons. The court says the assessor had jurisdiction of the subject matter. In making the assessment, he performed a judicial act.

So in the case of *The People* v. *Collins*, 19 *Wend.* 60, the commissioners were appointed, by act, to lay out a road commencing at or near the said village. The court say the word near, as here used, is a relative term, and the precise points were purposely left to be settled by the commissioners. Their duty was judicial. Matter of discretion is but another name for matter of judgment. The very act of creating a board for determining controversies and settling rights implies that the legislature cannot determine and settle. They therefore delegate judicial powers to others, with the intent that they shall hear, try, and determine finally. This is so of every court, every magistrate, and every commissioner.

So in the case of *Rex* v. *Harvey*, 1 *Black. R.* 20. The statute of 19 *Geo.* 2 required the Court of King's Bench to award execution of death against one accused of smuggling, who would not surrender within a certain time after proclamation at and near the place of the offence. The court refused to pass sentence, because the proclamation had not been made near enough. It was merely because of the word near that the King's Bench were not merely ministerial agents to perform a specific command. And yet can we suppose that their proceedings could have been questioned collaterally? 8 *N. Hamp. R.* 225; 3 *Comst.* 463; 22 *Conn. R.* 379; *Brittain* v. *Kinnaird*, 4 *More* 50; *S. C.*, 1 *Brod. & Bing.* 432; 8 *Johns. R.* 71; 10 *Johns. R.* 128; 13 *Johns. R.* 444; 9 *Johns. R.* 229; 12 *Johns. R.* 257; 15 *Johns. R.* 152.

In the case of *Tichenor* v. *Hewson*, 2 *Green* 26, this court decided that a justice of the peace acted judicially in granting an appeal.

But again, the writ of *certiorari* does not go to review ministerial action. Is it not the universal habit to send it to all judicatories exercising discretionary powers like those by these trustees, and thereby acting upon the assumption that such action is judicial? Upon an allegation that the trustees had put an illegal construction upon the word "capable," or upon what was meant by the term "in the district," would this court hesitate to award a *certiorari*?

If the action of the trustees be in its nature judicial, it is well settled—first, that its truth cannot be questioned collaterally; and 2d, that the defendants cannot be held civilly liable for error or fraud therein. *Rochester Lead Co.* v. *The City of Rochester*, 3 *Comst.* 466; *Weaver* v. *Devendorf*, 3 *Denio* 120, and the cases there cited.

In this last case the court say—"No public officer is responsible in a civil suit for a judicial determination, however erroneous it may be and however malicious the motive which produced it. Such acts, when corrupt, may be punished criminally; but the law will not allow malice and corruption to be charged in a civil suit against such officer for what he does in the performance of a judicial duty. The rule extends from the highest to the lowest, to jurors and to all public officers, whatever name they may bear in the exercise of judicial power."

The reason of this rule is obvious. The duties performed by the judiciary are duties performed for the supreme power, and by its command. It enters thereby into no relation with the citizen; its errors or frauds are offences against the government, which punishes them as it sees fit—in our state, by impeachment or indictment. But no government could permit the judicial acts of one tribunal to be questioned collaterally by another, without involving the whole judicial system in inextricable confusion. Every tribunal would be trying over again that which had been decided by another, and thus all litigation go on forever in a circle. The government acts upon

the information it receives from the judiciary, or not, in its discretion. If it does not, no harm is done by the decision of the court—it is a mere abstraction. If it does, it is the act of the government; it is the executive act which does the injury to the citizen. If a citizen complains of fraud or error, the mode of redress is by appeal to the government; which, before it acts, will generally cause the case to be reviewed by a higher tribunal of its own creation. But this is always done by a tribunal authorized to review, and the proceedings are had therein in the nature of a writ of error or appeal.

All courts, except those which act by way of review, within the limits of their jurisdiction, are of equal authority, and equally represent the supreme power—so much so that, in case of concurrent jurisdiction, the one which first gets possessed of the case retains it. But, where the jurisdiction is exclusive, no court not authorized to review can take cognizance without a usurpation.

Take this case. The statute has given exclusive jurisdiction to the trustees to ascertain and adjudge the number of children in each district of the required qualifications. This is a suit in the Circuit Court, not by way of review, to get a determination by it that the number of children in the district is different from that found by the trustees. The answer is, that both the circuit and the trustees serve the same master, who has committed that duty to the trustees alone.

It is argued, by the plaintiffs, that the action of the trustees is the same as that of a sheriff, when he is ordered to levy, under a *fieri facias*, upon the goods of A, and, by mistake or design, levies upon those of B; that, in such case, the sheriff must exercise discretion, and decide what goods are, and what are not those of the defendant in execution; and yet if he errs, that he is held liable collaterally. But the answer is, that the government has not given the sheriff any judicial power to determine whether they are the goods of B or not. He is not au-

thorized by the power to settle B's rights, but only those of A. And, so far as the rights of A are concerned, his action is final, and he cannot be made responsible.

When a judicial officer is commanded to decide a thing, whether he does it rightly or wrongly, he acts within the power. When the sheriff is commanded to levy upon the goods of A, and he levies upon those of B, whether he acts in good faith or not, he acts *without* the power; and he is liable, not because he is either a judicial or executive officer, but because he is commanded to do one thing, and he does another. He is not acting within the protection of his power. Both the judiciary and the executive act under powers of attorney from the government to one to perform for it mental action, the other physical. If the judge decides a matter not within the power, his action is merely void. As long as the executive officer is within his power, his act is that of the sovereign dealing with his subjects, for which he is not responsible; but the moment he steps outside of it, he no longer represents the government, and his relation to others is only that of citizen to citizen.

If the trustees have been guilty of error in law, it could be reviewed by *certiorari;* if of fraud, I do not see why, also, it may not be reviewed upon *certiorari,* upon the principles of the case of *Suydam* v. *The New Jersey Railroad Company,* 2 *Harr.* 25. Or they may, perhaps, be punished by indictment. But, whether so or not, it can give no authority to the Circuit Court to usurp the jurisdiction of these trustees, and try over again collaterally questions committed by the law to them.

The next question certified is—assuming the facts opened by the plaintiffs to be proved—can this action be maintained upon the pleadings? The suit is for money had and received. To sustain their action, they must show, 1st, that the money claimed was the property, either generally or specially, of the plaintiffs; 2d, that it had been received by the defendants.

Township of Morris v. Carey.

*First.* Had the plaintiffs any property, either general or special, in this money ?

It was money which they had paid over to the school superintendent; they had appropriated it for the schools in the township, and it has been so appropriated, and now the township seeks to recover it back. The manner in which it was divided among the districts is of no consequence as regards the township. The money was raised for schools, and for schools it has gone. The matter complained of is merely as to its distribution. This might be a source of complaint between the different districts, or between the superintendent and the defendants; but I cannot see how the plaintiffs are interested in that question as a matter of legal right. They pretend to have a claim on this money—not because they own or have any right to any part of it, but because others, who have the right to the whole of it, have not partitioned it out legally among themselves.

But again, as regards the funds derived from the state, the freeholders, the township collectors, and the superintendents are but the conduit pipes from the state treasury to the local teachers, and they are just as much the property of the state after they get into the hands of the school superintendent as they were in the state treasury; and the fact that, in going down, they happen to flow through the hands of the township collectors, gives the township corporations no rights in the fund.

As regards the funds raised by the township, when they once get into the hands of the school superintendent, they, also, are no longer township, but state funds. They are placed into the hands of the town superintendent by the state's orders, and to answer state purposes. They are paid out under the orders of the state. The school superintendent is not accountable for the administration of the funds to the townships, but to the state authorities. It is the duty of the state superintendent to see that these funds are fairly applied.

It is the favorite policy of the state to educate all her children. She passed the school law for that purpose; she raises her funds, in part, from the interest of the school fund, in part from the state funds, in part from the surplus revenue, in part from township taxation. But the money is all, when it once gets into the hands of the town superintendent, the state's money for the purpose of education. The township taxation is only the instrument whereby the state raises this portion of the funds. It is paid over, by the town collector, under the mandate of the statute, to the agent of the state, to wit, the school superintendent, to subserve a great object of state policy, to wit, the education of her people. Nor can I see how the defendants can be said to have received this money to the use of the plaintiff. It was not certainly for plaintiffs' use, for they were not entitled to the money, but either the town superintendent or the other districts. Nor can the defendants be charged with its receipt to anybody's use. It was not pretended that it was actually paid to them, but that it was paid to the teachers for actual service, upon their orders, as trustees, upon the town superintendent, in his official capacity. It cannot be averred that the money was paid to the teacher for the use of the defendants, because it is admitted that it was paid to him for his own use ; nor that it was had and received by the defendants for the use of the plaintiffs, because it was not received by the defendants in fact, nor by the teacher for their use.

But there is still one more consideration—the return of the trustees is conclusive, or it is not. If not conclusive, and the defendants should be held merely as individuals for money received by them for the plaintiffs' use, the defendants could not be held jointly liable in this action, because the only evidence of their receipt of the money is their written orders, no one of which is signed by *all* of the defendants.

Seiple v. Borough of Elizabeth.

I am of opinion that the Circuit Court of the county of Morris should be advised to discharge the rule to show cause.

OGDEN, J., concurred.